51 N.J. Super. 296 (1958)
143 A.2d 768
WILLIAM P. BREEZE, JR., BY HIS GUARDIAN AD LITEM PHILIP C. DANIELS, JR., PETITIONER-RESPONDENT,
v.
HERBERT J. ELKINS, INC. AND VAN WYK CONSTRUCTION COMPANY, INC., JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, RESPONDENTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 14, 1958.
Decided July 9, 1958.
*298 Before Judges PRICE, HANEMAN and SCHETTINO.
Mr. William G. Freeman argued the cause for respondents-appellants Herbert J. Elkins, Inc. and Van Wyk Construction Company, Inc. jointly.
Mr. A. Millard Taylor argued the cause for respondent Herbert J. Elkins, Inc. (Messrs. Carroll, Taylor & Bischoff, attorneys).
Mr. John Miller argued the cause for petitioner-respondent (Messrs. Lewis & Hutchinson, attorneys).
The opinion of the court was delivered by PRICE, S.J.A.D.
By this appeal Herbert J. Elkins, Inc. (hereinafter designated Elkins) and Van Wyk Construction Company, Inc. (hereinafter designated Van Wyk) seek the reversal of a joint judgment against them in the County Court December 3, 1957 in favor of petitioner William P. Breeze, Jr. by his guardian ad litem Philip C. Daniels, Jr. Said judgment was entered on appeal from a similar judgment entered July 25, 1957 in the Division of Workmen's Compensation in the sum of $14,580 plus incidental allowances representing a period of 486 weeks at $30 a week. The judgment awarded compensation as the *299 result of the instantaneous accidental death of William P. Breeze, father of William P. Breeze, Jr., on March 28, 1955.
At the time of his death decedent was performing work under a construction contract for the erection of a truss span sub-structure "for the Gloucester approaches from Gloucester Anchorage to Newton Creek of a bridge over the Delaware River connecting Packer Avenue in Philadelphia, Pa. and Gloucester City, New Jersey."
William P. Breeze, Jr., by his guardian ad litem, filed an amended dependency claim petition with the Division of Workmen's Compensation pursuant to N.J.S.A. 34:15-7 et seq. against the corporate defendants jointly, severally and in the alternative.
The appellants shall hereafter be referred to as joint adventurers.
The notice of appeal was as follows:
"Notice is hereby given that Herbert J. Elkins, Inc. and Van Wyk Construction Company, jointly, appeals to the Superior Court of New Jersey, Appellate Division, from that portion of a determination and Judgment entered by the Camden County Court, Law Division on December 3, 1957 in the above matter affirming the Judgment of the Deputy Director of Workmen's Compensation Division holding that (a) the petitioner's decedent was in the employ of Herbert J. Elkins, Inc. and Van Wyk Construction Company jointly; and (b) from that portion of a certain order entered January 2, 1958 which assessed counsel fees in favor of the petitioner and in favor of the defendant, Herbert J. Elkins, Inc., individually, against the respondent-appellant, Herbert J. Elkins, Inc. and Van Wyk Construction jointly.
 /s/ WILLIAM G. FREEMAN,
 Attorney for and of Counsel
 with Respondent-Appellant
 Herbert J. Elkins, Inc. and
 Van Wyk Construction Company
 Jointly."
The basic question presented by this appeal is whether the evidence justified a joint recovery against the two named corporations allegedly engaged in a joint adventure. Specifically, the issue is whether the court erred in holding that decedent's employers at the time of the fatal accident were the joint adventurers aforesaid and not Elkins solely.
*300 There is no dispute that the death of decedent arose out of and in the course of his employment, nor that William P. Breeze, Jr. is his only dependent. As stated, the single question is whether at the time of the fatal accident decedent was employed solely by Elkins or was employed by Elkins and Van Wyk jointly as corporations engaged in a joint adventure.
The contract for the work in question was of such scope that it could not be performed adequately and expeditiously by a single contractor. The contract between Elkins and Van Wyk jointly and Delaware River Port Authority was executed October 27, 1954. In it the Authority was designated "party of the first part," and Elkins and Van Wyk were therein designated as the contractor, "party of the Second part."
The contract inter alia provided as follows:
"ARTICLE IV  Laws and Regulations: The Contractor shall take out Workmen's Compensation Insurance insofar as the Work covered by this Contract is concerned and comply with the Compensation Acts of Pennsylvania and New Jersey and all other Municipal, State, or Federal legislation or regulations as they apply.

* * * * * * * *
ARTICLE XX  Insurance: The Contractor shall maintain during the life of his Contract adequate insurance as follows:
(a) Compensation Insurance: Adequate Compensation Insurance for all the Contractor's employees who will be engaged in work at the site of the Project. If any part of the Contractor's Contract is sublet, the Contractor will require his sub-contractor to maintain such insurance of all of the sub-contractors' employees who will be so engaged.

* * * * * * * *
ARTICLE XXXI  Responsibility of Contractor: The Contractor shall be deemed and considered an independent contractor in respect to the work covered by this Contract and shall assume all responsibility and expense for the Work, for risks and casualties of every description arising out of the nature of the Work, the action of the elements, or unforeseen or unusual difficulties. * * *"
Subsequent to the entry into the aforesaid contract with the Authority, Elkins and Van Wyk executed a written contract dated January 10, 1955 by which they agreed to a division of the work which they had jointly contracted to *301 perform as aforesaid. Their contract with the Authority on October 27, 1954 was by reference incorporated in and made part of the contract of January 10, 1955. In the latter contract each agreed to assume full responsibility for furnishing materials and performing the work referable to designated portions of the total work encompassed by the main contract.
The contract between Elkins and Van Wyk provided inter alia as follows:
"1. ELKINS will provide all the materials and will perform all the work required under Item 1 of said contract and will receive from the sum allotted therefor 70% thereof and VAN WYK will receive the other 30% of the said sum; that is, $14,000 to ELKINS and $6,000 to VAN WYK. As payments are received under said contract for the materials and work performed by ELKINS under Item 1, 70% of each payment will be distributed to ELKINS and 30% of each payment will be distributed to VAN WYK within forty-eight hours from the receipt of such payments by the parties hereto.
2. ELKINS will provide all the materials and perform all the work required under Items 2, 3, 4, 5, 9, 10, 11 and 13 of the said contract and shall receive therefor the unit prices and lump sums designated for the same in the said items.
3. VAN WYK will provide all the materials and perform all the work required under Items 6, 7, 8 and 12 of the said contract and shall receive therefor the unit prices and lump sum in the said items.
4. Each of the parties hereto will supply all moneys, equipment, labor, materials, supervision and all other items or services required to perform the work and comply with all obligations allotted to it under this agreement; to wit, ELKINS will furnish the capital, equipment, labor, materials and supervision required to initiate, prosecute and complete Items 2, 3, 4, 5, 9, 10, 11, 13 and the part of Item 1 allotted to it of the said contract; and VAN WYK will furnish the capital, equipment, labor, materials and supervision required to initiate, prosecute and complete Items 6, 7 and 8 and 12, and the part of Item 1 allotted to it of the said contract."
The contract between Elkins and Van Wyk further provided for the prompt payment of sub-contractors and materialmen having claims arising out of the performance of the respective portions of the work. It contained a provision that each corporation would pay its employees the salaries and wages due them in connection with the prosecution of the work required under the part of the contract allotted to each. It contained a clause as follows:
*302 "If at anytime either party shall fail to make payment as herein specified, the other shall have the right and authority to withhold from any sums or payments which may be due or received, but not paid, for the account of such defaulting party, sufficient moneys to make payment for such proper and lawful debts, salaries or wages."
Each party had the right to require the other to exhibit receipts for any claims or indebtedness arising out of or connected with the performance of the work allotted to each, with provisions for the protection of one party in the event of default by the other in the discharge of such items.
The contract further provided in part as follows:
"6. The parties hereto shall secure all bonds and insurance required for the performance of all items of the said contract and as required by the same in their joint names and each party will pay for such portion of the total premiums due as the portion of the contract to be performed by each shall bear to the entire contract. * * *
7. Each party will set all lines, grades and provide all layouts and other required services for the items allotted to it and shall provide a qualified superintendent for the work assigned to it until said work shall be satisfactorily completed and accepted by the said Port Authorities. The superintendent of each party shall not have the authority to incur any debt or obligation on behalf of the other and shall exert his best endeavors at all times during the performance of the items or part thereof assigned to each to expedite the performance of said work and to promote harmony, coordination and cooperation for the mutual interest for both parties in the performance of the work itself and in the creation and maintenance of good public relations.
8. Each party shall furnish its own watchmen as it shall determine necessary and shall provide proper safeguards for the protection of its own employees and other persons lawfully in and about premises and each shall bear the loss of its own materials or equipment which may be stolen, damaged, destroyed or missing unless the same shall be due to the neglect or fault of the other party.
9. Neither party shall make or agree to any change in the plans or specifications of any work to be done under the terms of the said contract except insofar as that work which shall be totally performed by it and as to any other work, any change, omission, or addition thereof or thereto shall require the written approval of the other party. If any party shall incur any expense or obligation for the other without the written approval of the other, it shall bear the cost thereof or loss occasioned thereby.
10. * * * all communications, notices or writings required to be sent, delivered or mailed to the Delaware River Port Authority concerning or connected with the said contract, shall be approved *303 by both parties before mailing or delivery and each party shall receive a copy of all of the same.

* * * * * * * *
13. All checks from the Delaware River Port Authority to the parties hereto for the performance of any part of the said contract, shall be forwarded to and received by ELKINS and shall be deposited in the Upper Darby National Bank in an account under the joint names of both parties requiring the signature of both parties for any withdrawal. The amount due to each party shall be disbursed within four days from the receipt of said checks. Any checks for work done exclusively by one party shall, upon identification of both parties, be turned over to the party who shall have performed the said work. * * *
14. Each party shall be responsible for the proper performance of the part of the said contract allotted to it and shall assume all liability in connection therewith. Each shall prosecute the work in such a manner as not to interfere with or delay the other party, to the end that the entire contract shall be completed within the time required thereunder, in accordance with the specifications therefor, and so as to avoid the incurring of any penalties. * * *"
At the termination of plaintiff's case before the Deputy Director, Elkins moved for the dismissal of the claim petition as against it severally. It contended that decedent's employers constituted the joint adventure. Van Wyk moved for dismissal of the petition as against it severally and also as against the joint adventurers. Its contention was that Elkins was the sole employer of decedent. The Deputy Director held that there was "a community of interest in the operation of their work so as to constitute a joint enterprise in which both respondents had joint interests and joint control of the work and indirect control of the individual employees." He granted Elkins' motion. He granted Van Wyk's motion that the claim petition be dismissed as to it severally. Neither party offered any evidence on defense. The Deputy Director then determined that Elkins and Van Wyk were "jointly and equally liable."
On appeal the County Court also determined that the joint adventurers constituted the employer of decedent. It dismissed the petition as to Elkins and Van Wyk severally and directed the entry of judgment in favor of petitioner and against Elkins and Van Wyk jointly. This appeal followed.
*304 We have reviewed the entire record of this case in conformity with the opinion of the Supreme Court in Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958), wherein this court's appellate function was defined as follows:
"From a study of the entire record it is the function and duty of the reviewing court to make a determination according to its considered judgment, and in doing so it is mandatory only to give due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses. A finding of fact in the Division or appellate courts does not lessen the duty of the appeal court to determine the facts and evaluate them by full investigation and analysis of the evidence so as to adjudge whether the general finding is consistent therewith, i.e., if upon such total consideration of the record and views expressed below, it is believed the judgment both in fact and the applicable law from which appeal is taken is correct, it should be affirmed; if the judgment is erroneous, it should be reversed or modified."
See also Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445 (1958).
We proceed to weigh the evidence with due regard to the opportunity of the trial court to judge of the credibility of the witnesses.
The joint adventurers contend that by the 1955 contract between Elkins and Van Wyk the corporations had divided their responsibilities under the joint adventure involved in the Authority contract and each had preserved its own organization for the purpose of performing the respective portions of the work as divided between them; that decedent was on Elkins' payroll at the time of his death; and that the right of control and direction of decedent rested in Elkins only.
Elkins contends that the right of control of decedent rested in the joint adventurers; that all of the employees on both payrolls were engaged in the fulfillment of the Authority contract; that decedent suffered his fatal injury in the performance of the work encompassed by the Authority contract and that the fact that a collateral contract between the two corporations was executed cannot lessen the force of the factual situation that the work for the Authority *305 was proceeding by virtue of the contract it had with Elkins and Van Wyk jointly.
Prior to the execution of the Authority contract Elkins and Van Wyk jointly submitted a contractor's proposal to perform the work, to which proposal was appended a surety's consent to execute a "Completion, Labor and Materialmen's Bond" for its fulfillment.
The Authority contract awarded to Elkins and Van Wyk admits of no doubt that the construction work contemplated by it was the obligation of the joint adventurers. It provided, as noted above, that the joint adventurers would procure workmen's compensation insurance insofar as the work covered by the contract was concerned and would maintain during the life of the contract "Adequate Compensation Insurance for all of the Contractor's employees who will be engaged in work at the site of the Project * * *." Precisely this course was followed. A separate policy of insurance which covered various types of liability and included workmen's compensation coverage was at the request of the Authority procured by the two companies which were jointly listed after the designation: "Name of Insured." Said policy was procured for the specific authority contract and was operative in the coverage of the specific work defined therein. The policy was dated January 12, 1955. Its expiration date was October 27, 1955. It was in force at the time of the fatal accident. The insurance company which wrote the policy is the one which audited the payrolls of both Elkins and Van Wyk, involved in the performance of the work under the joint contract.
The decedent performed work as contemplated by the Authority contract from October 1954 to March 28, 1955, the date of his death. During that period he performed work thereon as general laborer and later as foreman and assistant superintendent.
At the hearing before the Deputy Director and on the argument before the County Court opposing litigants stressed the importance of the right to control as determinative of the question of who was the actual employer of decedent at the time of the fatal accident. Counsel for Elkins contends *306 that it is clear from the record that directions were given by the superintendent of Elkins to employees of Van Wyk and vice versa. The joint adventurers assert the contrary.
Diverse contentions are made by Elkins and the joint adventurers as to the extent of control of the employees of one company by the superintendent or those in authority of the other. It is clear from the record, however, that generally any dissatisfaction a supervisory official of one company had with reference to the work of an employee on the payroll of the other company or in the matter of any direction which he might desire to give in connection with such work would be expressed by transmitting his wish to an official of the other company. Moreover, as appears in excerpts from the testimony hereinafter quoted, one occasion, cited as illustrative of others, was recalled by the president of Elkins in which he personally directed the superintendent on the Van Wyk payroll to move some material blocking the construction work. The testimony of the respective presidents demonstrates the working arrangement the respective companies had in the actual prosecution of the work covered by the Authority contract.
The president of Elkins testified as follows:
"Q. Now, with respect to the prosecution of the work, did you have the right, or did you if there was a lag, direct Van Whyk [Van Wyk] employees, and did Van Whyk [Van Wyk] direct your employees if there was a lag or something that required the direction of the others?
MR. FREEMAN: Is it the right, or did they do it? A. Yes, we did from time to time as the situation arose and one particular instance, there was material being used by Van Whyk [Van Wyk] Construction in the way of our operations and I personally directed their superintendent to move it, and I am sure there would be other occasions during the course of the job where both superintendents exchanged orders to each other regarding the prosecution of the work as outlined in the contract.
Q. So that whether they were your employees on your payroll or the employees on the payroll of Van Whyk [Van Wyk], all employees were working for the Van Whyk [Van Wyk] Construction Company and H.J. Elkins, Inc. in the performance of this joint venture?
MR. FREEMAN: I object, it is a conclusion. Mr. Taylor is  I know exactly what he is trying to prove and I don't think he may ask this witness this question. It is a conclusion.
*307 MR. TAYLOR: Here we have a joint venture where two parties, two corporations, get together and they have men for the performance of their joint obligation, and that is specifically what was done here, and the proofs so far disclose 
THE COURT: I will permit it. Rephrase the question. Leave out the words `joint venture.'
MR. TAYLOR: I will strike the words `joint venture.'
Q. All employees were working in fulfillment of the contract, that is the original contract for this job which has been marked in evidence R-3? A. Yes.
Q. And they were engaged solely in the performance of the work required under the contract which is marked in evidence R-3? A. I would assume that that question would have to have the facts were these employees used in any other contracts or any other jobs. They were all employed on this contract and their duties and time was spent on this job.
Q. So that all employees that were on either payroll were engaged in the fulfillment of this specific contract? A. Yes.
Q. And as such, either you as the president of Elkins, or Mr. Van Whyk [Van Wyk] as the president of Van Whyk [Van Wyk], had the right to supervise and control all employees.
MR. FREEMAN: I object, if the Court please. The very agreements speak for themselves 
THE COURT: I will permit it.
A. As I previously stated, we had that right with regard to the superintendent or foreman of either company. We did not persist any other authority than to convey our orders to the superintendent, superintendent to superintendent, or Van Whyk [Van Wyk] to Elkins, or Elkins to Van Whyk [Van Wyk], that is what orders were carried out specifically.
Q. In other words, that was the agreement between you and Mr. Van Whyk [Van Wyk] as presidents of the two companies. A. Regarding the proper performance of the work. In other words, if the work was not being performed properly to the satisfaction of either of the parties, and the production on the job was lagging, then the one superintendent would say to the other superintendent, such and such must be done in order that there is no interference with the operation of either company.

* * * * * * * *
Q. Mr. Elkins, did you testify originally that the superintendents, your superintendent and Van Whyk's [Van Wyk's] superintendent would exchange information back and forth in order to expedite the work, is that correct? A. I believe that my testimony would reveal that not only did the superintendents exchange what I would consider orders, not information, I would consider them orders. I ordered the superintendent to move the material that was in my way. I think Van Whyk [Van Wyk] asked, ordered my superintendent to take whatever necessary steps were required to expedite the work.
Q. And did you not testify, in Mr. Taylor's cross-examination, that it did not go beyond the superintendents? A. The men were *308 not directed, either personally by Mr. Van Whyk [Van Wyk], or myself, personally.
Q. Would one of your superintendents  would one of Mr. Van Whyk's [Van Wyk's] superintendents direct Mr. Breeze, for instance? A. It is quite possible, although it is not protocol.
Q. And would Mr. Van Whyk's [Van Wyk's] superintendent have the right to fire one of your employees, and specifically, Mr. Breeze, if he disobeyed or did not carry out his request or directions? A. I would say that any employee of Van Whyk [Van Wyk] or Elkins quite possibly could be discharged if he refused to carry out the work properly, regarding the finished product, regarding the classification of the work. If the work was done improperly, if we saw the men doing the work improperly, which would reflect upon the reputation, our reputation, I think that Mr. Van Whyk [Van Wyk] or myself would force the other party to discharge.
Q. Now, how would you do that, by request of Mr. Van Whyk [Van Wyk]? A. To the superintendents.
Q. And so that the superintendent of Van Whyk [Van Wyk] would fire an employee of Van Whyk [Van Wyk]. A. Either would.
Q. One of your superintendents would fire Breeze if Breeze did something he shouldn't do? A. Upon the direction of the employer.
Q. In other words, the complaint would be registered by Van Whyk [Van Wyk], and then it would be up to your superintendent to take appropriate action, is that true? A. That is right.
Q. Now, you spoke about these employees, this job started when? A. I am not sure of the exact date but I believe it was sometime in October.
Q. '54? A. Yes.
Q. You were performing work on the bridge from October '54 to March 28, '55? A. Yes, I was.
Q. Did you perform other work during that period aside from this particular contract? A. Yes, I was.
Q. And during that period of time, did Bud Breeze ever work on any other job? A. Not to my recollection.
Q. Did any of your employees, superintendents or other employees who worked on this job from October '54 to March of '55 ever work on any other job of yours?

* * * * * * * *
Q. As I understand your testimony, Mr. Elkins, your superintendent would not have the right to fire an employee of Mr. Van Whyk [Van Wyk] or vice versa, or Mr. Van Whyk's [Van Wyk's] superintendent wouldn't have the right to fire one of your employees, is that correct?
MR. TAYLOR: I object. That is not at all what the man testified to. He is putting words in the witness' mouth.
A. The question, as I understand it, where this objection was regarding whether my superintendent would have the right, he would certainly have the right indirectly, but not directly to put out, to write a check out for the man.
Q. And remove him from the payroll? A. But he would have the right to see that he was removed as I testified previously."
*309 The president of Van Wyk gave the following testimony with reference to the same subject:
"Q. Mr. Van Whyk [Van Wyk], the two jobs were in part being done at the same time, were they not? A. Yes, his organization and mine were working there at the same time.
Q. Now, you coordinated the two organizations together as much as possible to expedite the work, there is no question about that, is there? A. Yes.
Q. And if some of Elkins' men were not working in the manner that you felt they should, you would talk to Mr. Elkins about it and he would talk to you about it and arrange it so the two companies would coordinate the work together, that is correct, is it not? A. It didn't work quite that way. He had to get the foundation in before I would move to that phase of the job. He'd have to put the foundation in before I would move my men and equipment on that pier and continue with the work. In other words, there was nothing my organization could do on that pier on that phase of the job until he was out of there.
Q. But, if there was any lag in the production, you would talk with Mr. Elkins to see that this lag was taken up right away, wouldn't you, and rely upon him to talk to the men so that you could get your crew in? A. If he wasn't getting the foundation done when he should, yes, I told him about it.
Q. You told him about it with the request that he speed his men up? A. Speed his men up, to do whatever he wanted, hire more men, get more equipment, whatever was necessary.
Q. And for the benefit of both of you, it was necessary that you did talk with each other that way from time to time? A. Yes, we talked to each other."
Several factors lead us to the conclusion that the judgments entered by the Deputy Director and the County Court were correct.
First: The contract between Elkins, Van Wyk and the Authority required the joint adventurers to procure and maintain workmen's compensation insurance covering employees engaged in the completion of the work under that contract. They complied. Such insurance was procured. Appellant contends that this fact is "immaterial to the sole question here under review." We are not in accord. To attribute no significance to the procurement of such insurance effective during the operation of the contract and covering the work involved in the contract would label such an act an idle gesture and the contract to procure said insurance *310 equally meaningless. If the procurement of this insurance were without significance it would mean that, despite the insurance company's acceptance of the premium paid for the type of coverage immediately related to the case at bar, it was free to repudiate the very coverage contemplated by the contract. We find and determine that the provision for workmen's compensation insurance was designed to insure protection against the results of industrial accidents, occurring during the performance of the work covered by the joint contract with the Authority. Its procurement by the joint adventurers is persuasive evidence that for the duration of the contract the employees of Elkins and Van Wyk were deemed and considered by Elkins and Van Wyk as employees of the joint adventure and entitled in the event of injuries occurring during the performance of the work under the Authority contract to the protection of such insurance which the law requires employers to carry. R.S. 34:15-70 et seq.
Second: The opposing views expressed by Elkins and the joint adventurers as to the mode and manner of control exercised by Elkins and Van Wyk over the workmen on the respective payrolls and as to the scope of the right of control over the same workmen were centered on evidence reflecting the practical details involved in the day-by-day activity of coordinating the efforts of each company to achieve a common goal, viz., the completion of the work involved in their joint contract.
Appellants stress the evidence that Breeze continued on the Elkins payroll throughout the performance of the joint contract, as did other workmen of Elkins employed in the performance of the Authority contract; that Van Wyk retained its men on its payroll during the prosecution of the joint contract work; that there was no exchange of employees between the two companies; and that each retained its own organization.
The Deputy Director, in dealing with the issue whether Breeze at the time of his death was in the employ of Elkins or of Elkins and Van Wyk jointly, determined that the "entire relationship between the two corporations was such *311 that it is reasonable to infer that there was a community of interest in the operation of their work so as to constitute a joint enterprise" in which they had "joint interests and joint control of the work and indirect control of the individual employees."
The County Court, in assessing the above quoted testimony, said that the entire relationship between the companies was such that there was a community of interest in the work of the two companies "so as to constitute a joint enterprise, in which both had joint interest and joint control of the work."
In general we approve the County Court's detailed analysis of the effect of the testimony on the issue of the right of control, as outlined in cases such as Larocca v. American Chain and Cable Co., 13 N.J. 1, 6 (1953); Devone v. Newark Tidewater Terminal, Inc., 14 N.J. Super. 401 (App. Div. 1951). We emphasize that the case at bar, however, contains an element not found in the so-called borrowed servant cases. We hold that the crucial element in this case is the role occupied by the presidents, superintendents and workmen of Elkins and Van Wyk. When the president or superintendent of Elkins, for illustration, acted on any phase of the work under the joint contract, whether in directing the men on the Elkins payroll or in making suggestions to the president or superintendent of Van Wyk, he was doing so as a representative of the joint adventurers in furtherance of the work encompassed by the joint adventure. Each of the men in control, regardless of the source of his salary, was for the duration of the Authority contract participating in the joint adventure and acting in its furtherance. The fundamental status of the persons in authority in each company is the criterion in the case at bar. When any such person gave an order, direction or suggestion he was doing so in the prosecution of the joint adventure work and not in the role of a representative of a single company. To hold otherwise would be to ignore the entire nature of the joint obligation undertaken by the two companies.
It is clear that a joint adventure was here involved. Stein *312 v. George B. Spearin, Inc., 120 N.J. Eq. 169, 175 (Ch. 1936); New Amsterdam Casualty Co. v. Popovich, 18 N.J. 218, 225 (1955).
We determine that the judgment of the County Court against Elkins and Van Wyk jointly awarding petitioner $30 a week for 486 weeks, allowing his counsel a fee of $2,000, payable $500 by petitioner and $1,500 by the joint enterprise, and allowing $250 for funeral benefits is proper and is hereby affirmed.
Appellants also challenge the allowance by the County Court of an attorney's fee of $500 to the attorneys of Elkins severally, payable by Elkins and Van Wyk jointly, for professional work performed on the County Court appeal.
The contest in the case at bar is essentially between two insurance carriers.
The allowance of the challenged counsel fee is justified by virtue of R.R. 5:2-5(f) which is as follows:
"The county court may, in its discretion, allow a reasonable attorney's fee to the prevailing party on appeal from an order or determination of the division of workmen's compensation for his services in the county court * * *."
Comparable words in R.S. 34:15-67 (repealed L. 1953, c. 33, p. 599, § 59) received judicial interpretation in National Products Refining Co. v. Court of Common Pleas, 129 N.J.L. 373, 375 (Sup. Ct. 1943) which also was a contest between two insurance companies. In that case it was held that allowance of a fee "to the party prevailing in the trial of such appeal" was not limited to a contest between employer and employee "but is broad enough to cover any appeal wherein one contesting party prevails against the other in a matter arising under the Workmen's Compensation Act." We find the aforesaid fee reasonable and its allowance is affirmed.
In view of our conclusions in this case the challenge by Elkins to the right of the joint adventurers to appeal from the judgment of the County Court to this court becomes academic.
Affirmed.