75 N.J. Super. 108 (1962)
182 A.2d 373
ELIZABETH S. DEL PESO AND THERESA DEL PESO, PETITIONERS-RESPONDENTS,
v.
H.A. BAR AND RESTAURANT CO., INC., H.T. BAR AND RESTAURANT CO., INC., RESPONDENTS-APPELLANTS, AND TISCH MANAGEMENT, INC. AND WELLS PLAZA HOTEL CORPORATION, ET ALS., RESPONDENTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 9, 1962.
Decided June 18, 1962.
*111 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. William T. McElroy argued the cause for appellants (Messrs. Shaw, Pindar, McElroy, Connell & Foley, attorneys; Mr. McElroy, of counsel; Miss Sonia Napolitano, on the brief).
Mr. Augustine A. Repetto argued the cause for respondent, Tisch Management, Inc. (Mr. Daniel DeBrier, attorney; Mr. Repetto, of counsel).
Mr. Alexander K. Blatt argued the cause for respondents, Elizabeth S. Del Peso and Theresa Del Peso.
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is a workmen's compensation case presenting a fairly novel mixed law-fact question concerning the existence of the employment relationship between the owners of certain hotels and a ranking member of the operating staff of the management agency which ran the hotels on a percentage of profit basis under independent contract with the owners. That person was fatally burned on January 19, 1958 in an accident concededly arising out of and in the course of his employment. Under the contract mentioned, all "employees" were to be considered as "in the employ of Owner solely and not in the employ of Agent." Moreover, the individual in question was actually paid by the agency for his services out of funds of the owners.
The Division of Workmen's Compensation held the petitioners' decedent was employed only by the management agency and not by the owners. On appeal the Atlantic *112 County Court held he was in the joint employ of the agency and the owners. The present appeal is only by the owners, the agency's position being that the determination of the county court should be affirmed in all respects. There is therefore no issue on the present appeal with respect to the proposition that the decedent was an employee of the agency. The only problem for decision is whether he was not also simultaneously an employee of the owners. Since the respective insurers are both financially responsible, and compensability is not contested, petitioners, while contending for an affirmance, have no substantial pecuniary stake in the dispute. The contest is really between the respective insurers of the agency and of the owners. That consideration, nevertheless, does not obviate the necessity for a judicial examination of the question of the owners' liability to the petitioners on the basis of the same factors which would be pertinent were they alone asserting such liability.
Involved in the appeal are also questions concerning the quantum of attorney's fee awarded petitioners and as to whether any allowance of attorney's fee should have been made at all to respondent Tisch Management, Inc. (the managing agent).

I.
The factual background is as follows. For some time prior to December 3, 1956 the Tisch family, through separate corporate instrumentalities, operated the Ambassador and Traymore Hotels in Atlantic City and the Belmont Plaza Hotel in New York City. They held the fee of the Traymore property, and leaseholds of the others. On or about the date mentioned, by a series of transactions apparently contemporaneous and integrated in scheme, the proprietary interest of the Tischs passed to persons identified in the record as the Wells interests, title to the Traymore property ultimately vesting in H.T. Bar and Restaurant Inc. (H.T. Bar, hereinafter), to the Ambassador leasehold in H.A. *113 Bar and Restaurant Inc. (H.A. Bar, hereinafter), and to the Belmont Plaza leasehold in Wells Plaza Hotel Corporation (Wells Plaza, hereinafter). Simultaneously, three separate management agency contracts, one for each hotel, were entered into by another Tisch corporate affiliate, Tisch Management, Inc. (T.M.I., hereinafter), two being with corporate intermediaries in the transaction, but in effect taken over and adopted by H.T. Bar and H.A. Bar, respectively, as owners, and the third with Wells Plaza, as owner. These agreements were identical, except as to the basis for computation of the fee payable to T.M.I., which varied.
By each of the contracts referred to, the owner appointed T.M.I. as "exclusive operating and managing agent" of the particular hotel property. Exclusive management and control, subject to certain limitations not here material, was vested in the agent. The agreement was for a five-year term, renewable and terminable under stated conditions. The owner was to pay the agent for its services stated percentages, on a sliding scale, of the "net profits." Paragraph 6 provided as follows:
"6. Agent agrees in behalf of Owner to supervise the work of, and to hire and discharge employees. Agent agrees to use reasonable care in the hiring of such employees. It is expressly understood and agreed, however, that all employees are in the employ of Owner solely and not in the employ of Agent and that Agent is in no wise liable to others for any act or omission on the part of such employees nor to employees for their wages or compensation."
Paragraph 7 provided that the agent should maintain a special bank account and deposit therein all moneys received on behalf of the owner, the fund to be used to pay expenses of operation of the hotel and not to be mingled with funds of the agent. Under paragraph 11 the owner agreed to hold and save the agent harmless against any claims or damages arising out of the operation of the hotel except for the agent's gross negligence. Paragraph 14 called *114 for the owner to carry various kinds of insurance, including workmen's compensation, and upon request to designate the agent as a party insured with the owner.
Paragraph 21 was as follows:
"21. It is agreed that the Agent shall pay no salaries chargeable to Owner to any stockholder, officer or director of the Agent or of Tisch Hotels, Inc. (New York) or Tisch Hotels, Inc. (New Jersey). It is further understood that the salaries of Preston R. Tisch, his secretary and his executive secretary shall be paid by Agent at its sole cost and expense and shall not be charged to Owner. With respect to any employees employed by Agent or the Tisch Hotel Chain whose functions include employment on behalf of both Owner and others, it is understood Agent shall make an equitable allocation of salary."
Paragraph 28 reads as follows:
"28. Agent herein shall at all times be owned, controlled and under the supervision and direction of Al Tisch, Preston R. Tisch and Laurence A. Tisch or any one of them."
The evidence indicates that at all times here material T.M.I. conducted the three hotels pursuant to these contracts and that its financial dealings and accountings with the owners were governed thereby. The owners monitored the performance of the contract and the operation of the hotels primarily through one George T. Hecht, an accountant in the auditing firm of Joseph Engleman, who not only examined the operating accounts, including payrolls, on a continuing basis, but also made personal observation of the actual operations, and reported his findings to the owner interests.
Now to fit the position of the decedent into this background. Robert J. Del Peso first joined the Tisch hotel enterprises in March 1952 as food and beverage manager at the McAlpin Hotel in New York City. His employer, technically, was Tisch Hotels, Inc., N.Y., a New York corporation. In September 1954 he became employed by The Ambassador of Atlantic City, Inc., a New Jersey corporation *115 owned by the Tischs, with which he held the position of general manager of the Ambassador Hotel. In August 1956 he became general operations manager of the Ambassador, Traymore and Belmont Plaza Hotels. The Traymore was owned by Tisch Hotels, Inc., N.J., a New Jersey corporation, and the Belmont Plaza (leasehold) by Tisch Hotels, Inc., N.Y. Del Peso's salary, however, came only from The Ambassador of Atlantic City, Inc. Prior to Del Peso's assignment to the position last mentioned, the three hotels had been run directly by Preston R. Tisch, his brother Laurence A. Tisch and one Herbert A. Hoffman, all three of whom constituted the directorate of Tisch Management, Inc. Only the Tischs, however, were stockholders. They and sometimes other members of the Tisch family were the owners of the other Tisch corporations. Hoffman was most directly in charge of operations of the three named hotels prior to the engagement of Del Peso. Whether the owner corporations had a management contract with T.M.I. for the three hotels prior to the sale to the Wells interests, is unclear on this record.
After the sale to the Wells interests took place in December 1956, the general scheme of operation of the three hotels under the Tischs continued as before. Del Peso carried on as general operations manager. Apparently coordinate in rank with him in the management hierarchy was James R. Heimbaugh, Jr., in charge of sales. Each hotel had its own general manager. Altogether, there were some 12 or 15 people in the category of executives, according to the testimony of Mr. Hecht. But clearly Preston R. Tisch was the de facto head of the whole operation. It was he, for example, who sat down with Jay Wells, leader of the new ownership interests, to negotiate points of difference or details of administration which came up from time to time in the practical effectuation of the agency agreement.
With the inception of the agency contract all executives and staff employees of the hotels were placed on the payrolls of the corporations set up by the Wells interests to take *116 title to the proprietary interest, whether fee or leasehold. Del Peso was paid out of the special agency bank account set up by T.M.I., pursuant to the agency contract, for the Ambassador Hotel, and thus out of operating revenues realized from that enterprise. This was apparently balanced off (as between the owner corporations) by paying Heimbaugh's salary solely out of the H.T. Bar account. Del Peso's salary was $12,000 per annum plus $500 per month for expenses. The bank accounts were actually listed in the respective ownership corporate names, e.g., "H.A. Bar and Restaurant, Inc.," with the further designation, "Tisch Management, Inc., agency account." No T.M.I. money went into these accounts. That company had its own bank account in New York. Withholding and social security taxes were deducted from Del Peso's salary as a purported employee of H.A. Bar. In March 1958, after Del Peso's death, the debit of Del Peso's salary was reallocated one-third to each of the corporate hotel owners, retroactive to the beginning of the management year, December 1, 1957. According to Mr. Hecht, this was done at the instance of the Wells interests, since Del Peso was working for all three hotels, and a more accurate calculation of the management fee would thereby result as the percentage of profit varied as between the hotels. Why this was not also done for the period prior to December 1, 1957, or in the case of other staff members like Heimbaugh whose services also extended to the three hotels, does not appear.
On January 16, 1958, three days before Del Peso's death, Preston R. Tisch, on his own initiative, and without consulting other directors of T.M.I., sent to all the directors of the company and all those in an executive capacity in the Tisch hotel enterprises, which included the new Americana Hotel in Florida and other hotels (19 persons altogether), the following memorandum:
 "To Those concerned from Preston R. Tisch
 TISCH HOTELS, INC. Date 1/16/58
 Subject:
*117 We are happy to inform you that the officers of Tisch Management, Inc. have elected at a recent meeting Robert J. Del Peso as Vice President  Operations, and James R. Heimbaugh, Jr. as Vice President  Sales."
News items of similar purport were also sent out to the hotel industry at large. Preston Tisch testified that Del Peso and Heimbaugh had not been actually elected corporate vice-presidents, but that the announcement was merely for the purpose of giving these men added prestige in the hotel industry. The designation, "vice-president," he explained, "is a loosely used term" in the industry for such prestige purposes, a professional status symbol, as it were. No change was effected in the actual duties, authority, or compensation of either of the named men as a result of the announcement.
N.J.S.A. 34:15-36 defines an employee as "synonymous with servant, and includes all natural persons, including officers of corporations, who perform service for an employer for financial consideration * * *." The case before us does not involve exploration of the significance and weight of various incidents of an association argued by opposing parties to be a true employment and an independent contractor relationship, respectively, as in Marcus v. Eastern Agricultural Ass'n, Inc., 32 N.J. 460 (1960), reversing, and adopting the dissenting opinion in 58 N.J. Super. 584, 596 (App. Div. 1959); cf. Hannigan v. Goldfarb, 53 N.J. Super. 190 (App. Div. 1958). In the present case, everyone involved agrees that Del Peso was someone's employee, and a construction of the factual complex in such manner as to promote the beneficent social purposes of the act to achieve compensability if reasonably possible is not appropriate, unless one takes the view that the stated objective is promoted by finding for multiple employment in order to minimize the hazard of nonpayment of compensation consequent upon absence of insurance coverage or insolvency of a particular employer, or the like.
*118 Petitioners and T.M.I. argue for the concept of joint employment in this case on the authority of such decisions as Breeze v. Herbert J. Elkins, Inc., 51 N.J. Super. 296 (App. Div. 1958) (decided on theory of joint enterprise of employers); Cser v. Silverman, 46 N.J. Super. 599 (Cty. Ct. 1957), affirmed 50 N.J. Super. 125 (App. Div. 1958); Andersen v. Well-Built Homes of Central Jersey, Inc., 69 N.J. Super. 246 (App. Div. 1961). But it is clear that this case is different from the last two cited in that, to the extent that T.M.I. is involved, there was no hiring of Del Peso by employers occupying coordinate positions vis a vis the employee, but rather an engagement of the workman by one putative employer (T.M.I.) expressly acting as agent for the others. Breeze is analogous in that the workman was actually hired by only one of the respondents, but was working on a project in which his direct employer and another were joint adventurers. The precise issue before us in the present case is therefore a new one in this jurisdiction. In broad outline, where an agent, although conducting a business constituting in all other respects an independent enterprise, deploys the services of an individual, who has previously been the employee either of itself or of other companies in the same proprietorship, toward the execution of an agency contract to operate hotels for their owner, in which contract it is agreed that all employees so engaged will be deemed the employees only of the owner, and the agent, agreeably to the contract terms, pays the person out of the owner's funds, does the relationship of employee-employer between the individual and the contracting owner emerge for purposes of the compensation act? In our judgment, the answer, on principle, is in the affirmative.
Appellants H.A. Bar and H.T. Bar adopted the terms of agency contracts under which T.M.I. would hire a staff to run the hotels and such staff personnel would be their employees. Consequently, if Del Peso was an operating staff member, he became under ordinary agency principles *119 an employee insofar as H.A. Bar and H.T. Bar were concerned. See 2 C.J.S. Agency § 105, p. 1256; Restatement, Second, Agency, § 222, p. 495, Illus. 1 (1958). Del Peso presumably knew he was on the payroll of one of the owner corporations and that they were being operated by T.M.I. as managing agent jointly for a single proprietary group; he may therefore be deemed to have impliedly assented to the employment status for workmen's compensation purposes.
The respondents argue that Del Peso was fully subject at all times prior and subsequent to the sale to Wells to the control, direction and dominion of T.M.I. and that therefore he was the employee only of T.M.I. The stated conclusion does not necessarily follow from the premise. It might well be said that every one on the operating staffs of the three hotels, down to the kitchen help, was under the control and direction of T.M.I. or of persons in turn subject to such direction. But if T.M.I. was employing them all in its agreed capacity of managing agent for respondents as owners, under an agreement which specifically provided that the people hired were to be employees of the owner, there is nothing in the law or the facts to preclude effectuating that understanding. The contracts are not conclusive, but are at least strongly evidential of the intent of H.A. Bar and H.T. Bar as to their relationship with the hotel employees, since they clearly adopted the contracts in their dealings with T.M.I. Cf. Breeze v. Herbert J. Elkins, Inc., supra. T.M.I. was thus properly exerting control over the employees, but pro tempore as agent of the owners. The agent's control thus became the principal's control. The owners would undoubtedly not even be resisting the claim were it a waiter, bellboy, or even an auditor or general manager of one of the hotels who was injured and claiming compensation. Where is the line to be drawn, and why draw it to exclude Del Peso? Respondents offer two responses.
*120 The first is that Del Peso provided the management of the hotels for which the owners bargained with T.M.I. as independent contractor through the agency contract. Therefore Del Peso could not logically also be an employee of the owners. As to this, the premise is not established by the proofs. The testimony is that Del Peso was not even mentioned when the management contract was negotiated. What the owners expressly bargained for in that regard, as indicated in Paragraph 28 of the agreement, was that the agent should continue to be owned and controlled by and under the supervision and direction of three named members of the Tisch family, a family well and apparently favorably known in the hotel business, which had shown good results in operating these very hotels. Though highly competent, and ranking high in the Tisch organization, Del Peso was simply one of the supervisory operating staff of the hotels. It was Tisch managerial acumen which put such men on its staff. The hotels were run by T.M.I. for 14 months after Del Peso's death before he was replaced.
Secondly, respondents contend Del Peso was made an officer of T.M.I. before January 16, 1958, and therefore was not to be considered an employee of the hotels by virtue of paragraph 21 of the agency contract. They cite the Preston Tisch memorandum quoted above. In this regard we find the testimony of Mr. Tisch persuasive that Del Peso never actually became an officer of T.M.I., at least in the sense of the meaning of the agreement. The sending out of the memorandum three days prior to the man's death, under the circumstances recited, did not change his fundamental status if prior thereto he was an employee of the owners within the intent of the act, as we think he was.
Supporting the holding-in as employer of a principal in roughly analogous circumstances are such cases as Brietigam v. Industrial Acc. Comm., 37 Cal.2d 849, 236 P.2d 582 (Sup. Ct. 1951), and Wigger v. Consumers Cooperative Association, 301 S.W.2d 56 (Mo. Ct. App. 1957) (placed on principle of joint enterprise); cf. Janesch v. Saks 34th *121 Street, 10 A.D.2d 749, 198 N.Y.S.2d 3 (App. Div. 1960); Janikowski v. Yardley's of London, Inc., 11 A.D.2d 577, 201 N.Y.S.2d 157 (App. Div. 1960).
As noted above, the only issue before us, T.M.I. not having appealed the County Court determination holding it as an employer, is whether H.A. Bar and H.T. Bar were employers of Del Peso. It is our ruling that they were.

II.
Appellants H.A. Bar and H.T. Bar appeal the allowance of attorney's fees against them in favor of T.M.I. by the County Court. The matter is governed by R.R. 5:2-5(f) which permits the County Court in its discretion to allow a reasonable attorney fee "to the prevailing party" on appeal from a determination of the Division of Workmen's Compensation for services in the County Court. One can be a prevailing party before the County Court even though he prevails on some but not all the issues contested there. Fitzsimmons v. Federal Shipbuilding & Dry Dock Co., 4 N.J. 110, 114 (1950). Appellants do not dispute this but say that T.M.I. prevailed on no contested issue in the County Court because it there sought only an adjudication that the owner corporations were the only employers of Del Peso, and made no alternative contention that if it was an employer, so also were the owner corporations. We disagree with the latter version of T.M.I.'s position in the County Court. Regardless of the form of statement of that position in T.M.I.'s County Court brief, which, apparently for tactical purposes, was simply by way of an assertion that Del Peso was jointly employed by the three owner corporations, its implicit objective was to secure the benefit of the pecuniary advantage attending a determination of the stated employer status of those corporations even were it to be held that all, T.M.I. and the others, were employers jointly.
We conclude that T.M.I. was a party prevailing in part, and therefore qualified for allowance of attorney fee in the discretion of the County Court. See Breeze v. Herbert J. *122 Elkins, Inc., supra (51 N.J. Super. 296, 312). We can find no fault with the exercise of such discretion in this instance.

III.
Appellants also appeal the allowance of a counsel fee of $2,500 to the attorney for petitioners in the County Court. The attorney had been allowed $3850 for services in the Division, of which $3100 was assessed against T.M.I. The argument is that the contest in the County Court did not substantially affect petitioners, as compensability was conceded, at least one responsible respondent had to be held liable, and the only practical issue was as to who was to pay the award and in what proportions. It is urged that the nature and extent of the attorney's services was comparatively slight.
We think appellants' position in this regard is basically well taken. No great effort was called for on petitioners' part in the appeal before the County Court, and counsel's responsibility was not heavy, although we concede it was entirely appropriate for petitioners to assert their claim against all the potential employers in the County Court as well as in the Division even though compensability was not in issue. Yet it is to be noted that petitioners did not appeal the exculpation of the owner corporations, nor argue against it in their County Court brief, although it was just as much in their interest to do so as to hold in T.M.I. They confined their argument in that seven-page document to the question of T.M.I.'s liability.
In fixing the fee at $2500 the County Court mentioned the amount of compensation involved, being $19,300, and the fact that none of the respondents paid the award until the litigation was disposed of. The latter circumstance is not shown to have been substantially relevant to the nature or extent of the attorney's services. In fixing a proper fee, the amount of the award has limited significance; the more important factors are the nature and extent of the services *123 and the responsibility involved. Neylon v. Ford Motor Co., 27 N.J. Super. 511 (App. Div. 1953). The allowance for petitioners' attorney's services in the County Court is found excessive and will be set at $750, payable in the same manner as fixed by the County Court.
Judgment is affirmed in all respects except as to attorney fee for petitioners for services in the County Court which is reduced to $750.