53 N.J. Super. 190 (1958)
147 A.2d 56
MARGARET ALICE HANNIGAN, PETITIONER-APPELLANT,
v.
DAVID GOLDFARB, t/a 20TH CENTURY CAB, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 1958.
Decided December 16, 1958.
*192 Before Judges SCHETTINO, HALL and GAULKIN.
Mr. Ferdinand Biunno argued the cause for appellant (Mr. Sanford Silver on the brief).
Mr. Mortimer Wald argued the cause for respondent (Mr. Simon J. Griffinger, attorney).
The opinion of the court was delivered by GAULKIN, J.A.D.
This is a workmen's compensation case. In the Division of Workmen's Compensation petitioner was awarded compensation for the death of her son, Donald Hannigan, who was killed while driving one of respondent's taxicabs. On appeal the County Court reversed, on the ground that the decedent was not an employee of respondent. The petitioner now appeals from the judgment of the County Court.
Respondent Goldfarb owns five taxicabs and "manages" five others belonging to his mother. Although the membership is technically in the name of his mother, for the purposes of this case we may consider him a member of the "Twentieth Century Taxi Cab Association," a New Jersey non-pecuniary profit corporation organized in 1938 (hereafter called the Association) about which more will be said later. Goldfarb's ten cabs were painted the same color and bore the same "20th Century Cab" insignia as the cabs of all other members of the Association.
Goldfarb insists he does not operate taxicabs, but only rents them. Petitioner admits the decedent (hereafter called Hannigan) agreed to pay Goldfarb $8 for every 12-hour shift during which he operated one of Goldfarb's cabs; that he kept all his fares and tips and did not account to Goldfarb for them; and that he paid for the gas and oil used during the time he operated the cab. (Hereafter, for brevity, we will call this the "three-phase arrangement.") Goldfarb *193 contends that this arrangement proves conclusively that, regardless of any other incidents of the relationship between Hannigan and Goldfarb, this was a mere rental and Hannigan was not an employee.
This appears to be a case of first impression in New Jersey. In other jurisdictions there is a split of authority on whether a driver under such an arrangement is an employee. See Annotations, 152 A.L.R. 520, 522 and 10 A.L.R.2d 369; 1 Larson, Workmen's Compensation Law, § 46.00 et seq. In some cases it has been held that the taxi driver may be the employee of the owner even under a "three-phase arrangement." Salt Lake Transportation Co. v. Board of Review, 5 Utah 2d 87, 296 P.2d 983 (Sup. Ct. 1956); Diamond Cab Co. v. Adams, 91 Ga. App. 220, 85 S.E.2d 451 (Ct. App. 1954); Redwine v. Wilkes, 83 Ga. App. 645, 64 S.E.2d 101 (Ct. App. 1951); Jones v. Goodson, 121 F.2d 176 (10 Cir. 1941); Kaus v. Unemployment C.C., 230 Iowa 860, 299 N.W. 415 (Sup. Ct. 1941). See also Kaus v. Huston, 35 F. Supp. 327 (D.C.N.D. Iowa 1940), affirmed on other grounds 120 F.2d 183 (8 Cir. 1941); Maher v. Commander Taxi Corp., 227 App. Div. 832, 237 N.Y.S. 831 (App. Div. 1929). In other cases (sometimes in the same jurisdiction) the courts have held to the contrary. Fidelity & Casualty Co. of N.Y. v. Windham, 209 Ga. 592, 74 S.E.2d 835 (Sup. Ct. 1953); Party Cab Co. v. U.S., 172 F.2d 87, 10 A.L.R.2d 358 (7 Cir. 1949), certiorari denied 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496 (1949); New Deal Cab Co. v. Fahs, 174 F.2d 318 (5 Cir. 1949), certiorari denied 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496 (1949); U.S. v. Davis, 154 F.2d 314 (D.C. Cir. 1946); Magruder v. Yellow Cab Co., 141 F.2d 324, 152 A.L.R. 516 (4 Cir. 1944); Coviello v. Industrial Comm., 129 Ohio St. 589, 196 N.E. 661 (Sup. Ct. 1935). See also Rockefeller v. Industrial Comm., 58 Utah 124, 197 P. 1038 (Sup. Ct. 1921).
Most of the above cited cases arose not under workmen's compensation acts but under social security and unemployment compensation acts. Nonetheless, for present purposes *194 their reasoning is apposite. Cf., De Monaco v. Renton, 18 N.J. 352, 357 (1955).
It is true that (as the annotation in 10 A.L.R.2d says, at p. 369), "* * * it must be pointed out that varying facts account in no small measure for the contrary results reached." One of those "facts" is the difference in the definitions of employee contained in the particular statutes involved. An illuminating illustration of the effect of the definition in a statute is given in detail in the Party Cab Co. case, supra, at page 89 of 172 F.2d. There the court pointed out that in 1935, when the federal Social Security Act was enacted, the term "employee" was not defined. The federal courts interpreted it broadly, beyond its strict common-law meaning, with reference to the purpose of the law to give protection to the alleged employee where the economic facts of the relationship seemed to the court to require such protection. Congress was not happy with that result, so in 1948 the law was amended, over the President's veto, to expressly provide that "employee * * * does not include any individual who, under the usual common-law rules * * * is not an employee." (It is interesting to note that in his veto message the President said the amendment would exclude "* * * persons working as * * * taxicab drivers * * *.") Since that amendment the interpretations of "employee" by the federal courts have tended to be upon strict common-law principles. This may account, in some measure at least, for the difference in the preamendment cases, such as Jones v. Goodson, supra, and the post-amendment cases. But see Larson, supra, § 43.41.
But almost equal in importance to difference in facts is the difference in the attitude of the courts of the several jurisdictions towards legislation such as the Workmen's Compensation Act. As Justice Rutledge said in N.L.R.B. v. Hearst Publications, 332 U.S. 111, 122, 64 S.Ct. 851, 856, 88 L.Ed. 1170, 1179-1180 (1943),
"It is enough to point out that, with reference to an identical problem, results may be contrary over a very considerable region of doubt in applying the distinction, depending upon the state or jurisdiction *195 where the determination is made. * * * In short, the assumed simplicity and uniformity, resulting from application of `common law standards,' does not exist."
Illustrating this, Justice Rutledge pointed out that on the same facts upon which the courts of New Jersey found there was the employer-employee relationship (Auer v. Sinclair Ref. Co., 103 N.J.L. 372 (E. & A. 1926), and Schomp v. Fuller Brush Co., 124 N.J.L. 487 (Sup. Ct. 1940), affirmed In re Schomp, 126 N.J.L. 368 (E. & A. 1941)), courts of other jurisdictions, whose attitude toward such legislation is different than ours, held there was not. As Larson says (§ 43.10):
"It has been said that precedents may be found on both sides of almost every conceivable situation in which the question [of `employment'] could arise. The explanation of this paradox  complete agreement on principles and endless disagreement in actual decisions  seems to lie partly * * * in the extent to which courts define status in view of the purpose served by the particular legislation rather than as a fixed and static concept."
The term "employee" in our Workmen's Compensation Act is not limited to narrow common-law concepts for, in addition to servants, it "includes all natural persons * * * who perform service for an employer for financial consideration." N.J.S.A. 34:15-36. This is a broad definition which includes relationships not ordinarily considered to constitute employment. Our act is construed to bring as many cases as possible within its coverage, Parker v. Zanghi, 45 N.J. Super. 167, 171 (App. Div. 1957); El v. Newark Star Ledger, 131 N.J.L. 373 (Sup. Ct. 1944). Cf., De Monaco v. Renton, supra; Parks Cab Co. v. Annunzio, 412 Ill. 549, 107 N.E.2d 853, 854 (Sup. Ct. 1952); Salt Lake Transportation Co. v. Bd. of Review, supra, 5 Utah 2d 87, 296 P.2d 983, at page 985. We therefore hold that in spite of such a "three-phase arrangement," a taxi driver may be an employee under our Workmen's Compensation Act.
Whether or not Hannigan was, in fact, an employee must be determined not upon that arrangement alone but *196 upon the totality of the facts surrounding the relationship. The testimony of the arrangement between Hannigan and Goldfarb was oral, but even if it were written (as Goldfarb said it was, in a contract which he said he could not find) the language which the parties used in the contract would not be conclusive. "We are not so much concerned with the formal wording * * * as we are with the factual relation * * *" when we inquire whether parties are employer and employee. El v. Newark Star Ledger, supra, 131 N.J.L., at page 379. Cf. Fenwick v. U.C.C., 133 N.J.L. 295 (E. & A. 1945); Electrolux Corp. v. Board of Review, 129 N.J.L. 154 (E. & A. 1942); Schomp v. Fuller Brush Co., 124 N.J.L. 487 (Sup. Ct. 1940), affirmed In re Schomp, 126 N.J.L. 368 (E. & A. 1941). "Regard must be had to the attendant circumstances and the object in view, and also the course of practice of the parties in its execution, since that is significant of the common purpose * * *." Fury v. New York & Long Branch R.R. & Co., 126 N.J.L. 25, 30 (Sup. Ct. 1940), affirmed 127 N.J.L. 354 (E. & A. 1941), certiorari denied 315 U.S. 815, 62 S.Ct. 800, 86 L.Ed. 1213 (1942). Cf., Galler v. Slurzberg, 31 N.J. Super. 314 (App. Div. 1954), aff'd o.b. 18 N.J. 466 (1955).
The parties here agree that whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done, it usually proves that the relationship of employer and employee does exist.
Since Hannigan took the cab daily, and did not return it until 12 hours later, Goldfarb contends that during those 12 hours he could not possibly have directed the manner in which the business was to be done. That, he argues, establishes conclusively that there was no control, and hence no employer-employee relationship. But that does not necessarily follow. "When the manner of performing the service is beyond another's control because of its nature, absence of direct control over such details" may become "insignificant in the overall view of the facts * * *." *197 De Monaco v. Renton, 18 N.J., at page 357. That is especially true where, as will be seen was the case here, the city by ordinance licenses the drivers and tells them how to behave, under pain of losing their licenses. We therefore turn to the overall view of the facts in the case at bar, and weigh it in the fashion directed by Russo v. United States Trucking Co., 26 N.J. 430 (1958).
The members of the Association are cab owners like Goldfarb, and he testified they all operate as he does. Goldfarb operates only through the Association. The certificate of incorporation of the Association provides that one of the purposes for which the Association was formed is "To regulate the methods and pass rules and to enforce such rules for the carrying on of the taxi cab business under one uniform system, and which shall apply to all of its members." (Emphasis ours)
On behalf of its members the Association maintains a garage, and offices in which a staff receives telephone calls from prospective passengers and relays them over its two-way radio system to the member cabs nearest the caller. The Association also maintains call boxes and open stands for the member cabs. It was admitted by Mr. Davis, secretary and treasurer of the Association, that the purpose of all this is to lead the public to believe that "20th Century Cab" is a large, responsible organization that gives good service.
To make sure that this objective will be accomplished, the Association requires each member to abide by the rules and regulations of the organization. Goldfarb testified that each member is responsible for the conduct of his cabs "in the company," and Davis testified that if a driver misbehaved "we would reprimand him and tell him if it happened again the owner of the cab would be told to sever relations with him."
Drivers are engaged by the individual owners. Each new driver is required to register with the Association. The Association notes the number of the cab assigned to him "so in case of any complaints we will know which one operated the cab on that particular day." If the driver is *198 given another cab he has to re-register; otherwise not. Hannigan registered only once, for in the five or six months he was driving for Goldfarb he always drove cab No. 272. With very rare exceptions his shift was 4 P.M. to 4 A.M., and Goldfarb himself said "Hannigan was the night man." During all this period Samuel Naroden operated this cab from 4 A.M. to 4 P.M.
Drivers who have never driven taxis before are trained. Davis testified (emphasis ours):
"Q. Does the Association have any control over the driver insofar as his operation of the cab is concerned? A. Well, just the normal rules of decency and not to overcharge, which is part of his contract agreement.
Q. Is the driver provided with a copy of any rules at the time he begins operating the cab? A. Oh, usually I'll tell him, if he is a new man, which is very rare  most of them are over and over again  the same fellows always work on cabs. They know what the score is. But if they are strictly a new man, they usually send him out with somebody else for a day or two, and I'll usually tell them, `Do you know what the rates are? Do you know how to operate a meter?' He is shown. `Do you know how to operate a radio?' He is shown, if he doesn't.
Q. Is he given a rate book? A. He can buy a rate book, which costs 50 cents to print, and we sell them for 50 cents.
Q. In that rate book is there a copy or is there a list of regulations for the operator? A. In the book there is  that tells him how to operate a radio and tells him to treat the customers decently, not to overcharge, not to steal a job, to mark the job down for his records; just the general rules."
Davis was a hostile witness subpoenaed by petitioner. The subpoena ordered him to bring with him, among other things, the list of rules and regulations he said was given to the drivers. When asked for it on the stand, he gave the incredible answer that he didn't have it because it was out of print, and a new batch was "in the printer's hands getting printed"! Were the rules and regulations to spring, full grown from the mind of the printer? Obviously not. Necessarily the printer (if there was a printer) had to have before him the rules and regulations to be printed. If Davis did not retain a copy he could have procured one from one of the many drivers, or borrowed the printer's, or made a handwritten or typed copy thereof.
*199 Later in his testimony Davis said that generally the rules were (emphasis ours) "not to overcharge, to abide by the rules and regulations set forth by the City Ordinance; not to mistreat people; just general conduct rules." Though Davis denied there was a printed rule or regulation respecting refusal to accept a passenger he said (emphasis ours):
"* * * It's one of those things that we pass amongst themselves. If a man does not take the job, we call him and find out why he didn't take those people. If he continues to do those things, we take  send him down to City Hall to answer questions to the License Commission. It's one of the City rules. They must take them."
It is therefore pertinent, to the question before us, to examine and consider the taxicab ordinance in effect during the period of Hannigan's employment, which was introduced in evidence. It provides for separate licenses for the "owner, lessee or bailee" of the taxicab (hereafter called the taxicab license), and for the driver. The application for the taxicab license must be made by the "owner, lessee or bailee" and must state "the rate to be charged." Any taxicab licensee desiring to change his rates must file notice of such intention with the Director of the Department of Public Safety. The ordinance contains limitations upon rates, and provides that a photograph of the holder of the taxicab license and a card showing the rates must be displayed in the cab, with a notice "that in case of any complaint, the Department shall be notified." The ordinance expressly provides:
"* * * nor shall any owner of a taxicab hire out or rent a taxicab to a taxicab driver, or any other person, for use within the City of Newark for a stipulated sum over a definite period of time."
It is to be noted that R.S. 48:16-2 and R.S. 48:16-12 provide that the operation of a taxi in any municipality without its express consent is a misdemeanor, and R.S. 48:16-10 provides that the consent may be revoked for failure to comply with municipal regulations.
The ordinance contains detailed regulations relating to the safety and the cleanliness of taxicabs; prohibits "side curtains *200 or shades"; and empowers the Director of the Department of Public Safety "to establish reasonable rules and regulations for the inspection of taxicabs."
The ordinance provides that no driver's license shall be issued to one addicted to drugs or liquor, or who has been convicted of a crime or of the violation of the ordinance, or who is not of good health and reputation.
The driver receives with his license a badge, which he must "constantly and conspicuously" display on his right breast. He must "wear a regulation chauffeur's cap, or a regulation coat or shirt, and must be clean and neat of dress."
The ordinance contains numerous and detailed provisions regulating how and where taxis may stand or cruise; behavior at theatres, railway stations and other public places; the use of taxi stands; and the use and illumination of taximeters.
If the taxi is used for an illegal or immoral purpose the penalty may be "suspension or revocation of owner and driver's licenses." The driver must give a receipt for the fare upon request; and in case of a dispute must have it settled by "the police officer in charge of the nearest police station." No person other than the driver may sit in the front seat. After every fare the driver must search the cab for lost or forgotten articles, and report them. Deception of passengers and misrepresentation is forbidden. Every trip must be recorded, and the record retained for 90 days. (The Association provides the drivers with the necessary forms.)
Finally, the ordinance provides that any person guilty of violating it shall, in addition to the suspension or revocation of the license, be liable to a fine not exceeding $25, in default of which he may be sentenced to jail for a term not exceeding 90 days.
It is not pointed out to us by respondent what instructions relating to "the manner in which the business shall be done" could have been given by Goldfarb to his drivers that were not included in the foregoing. It must be noted also that here respondent had not only the unfettered right (which not every employer has today) to sever relations with his *201 drivers, but he had the police power of the city behind him as well to compel the driver to perform as he should. Yet, in addition, the Association had its own "supervisors" checking the cab operations. Davis testified "anyone acting as a `director' acts as a supervisor." Since non-pecuniary profit corporations have trustees, not directors, we presume Davis meant each trustee is a supervisor. The certificate of incorporation provides that "the business of the corporation shall be managed by thirteen trustees," so presumably there were 13 supervisors. As a specific example of what the supervisors do, Davis said if a supervisor saw a cab was dirty, he would order the driver to get it washed. There was testimony also that the Association wouldn't tolerate gambling in the cabs or at cab stands.
Doubtless the supervisors saw to it that the rules and regulations of the city were obeyed by the drivers for, as we have seen, the cab owners' licenses depend on compliance. Cf., Larson (§ 44.32) in which he points out that "in some cases, it has been possible to make a strong showing of control by introducing detailed regulations such as safety codes * * * and proving that the employer was personally responsible for their observance, with the conclusion that the employer therefore had to have control over `independent' loaders and truckers to protect himself."
Why did Goldfarb, through the Association and its supervisors and other agents, do all these things? Was it not to please and entice the traveling public, and to enhance the reputation and advertise the name of "20th Century Cab" as a large, responsible organization that gave good service? It seems to us that it cannot seriously be argued that all this was also done to enhance the value of the use of the cab in the eyes of the drivers as would-be renters, so that they would prefer to drive 20th Century cabs over others. It seems to us obvious that the members of the Association, through the Association, were in the business of soliciting riders, not renting to drivers. Drivers they could get any time  for riders they were compelled to compete. In short, Goldfarb was a common carrier of passengers for hire. Cf., *202 Meridian Taxi Cab Co. v. Ward, 184 Miss. 499, 186 So. 636, 120 A.L.R. 1346 (and annotation) (Sup. Ct. 1939); Richmond v. Clinton, 144 Kan. 328, 58 P.2d 1116 (Sup. Ct. 1936). Goldfarb was definitely not in the cab rental business. Indeed his business card, placed in evidence, described him as "fleet taxi operator" and said not a word about renting cabs.
Goldfarb testified the driver could buy his gas and oil anywhere. However, in this his witness Naroden contradicted him. Naroden testified "we had to gas up at the 20th Century garage," and "I wasn't permitted" to gas up elsewhere.
It is true the driver had to repair any damage done to the taxi while he had it, but Goldfarb carried liability insurance to satisfy all claims for personal injury and property damage caused to passengers and others by the operation of the taxi.
The respondent strongly urges that the following further considerations prove that he did not have that control over Hannigan which he says is essential to the relationship of employer and employee. He says that so long as Hannigan paid the $8 to him, Hannigan did not need to work at all. He could shut off his radio altogether, or leave it on and ignore the dispatcher's message that a fare was waiting at a certain address. He was not allotted any particular territory, and could roam at will or not at all. He could park the cab in front of his apartment and go to sleep, or drive to the shore or to a ball game.
However, when we look realistically at the economic facts of the relationship between Goldfarb and his drivers, we see that this alleged freedom not to work is fanciful. It is refuted by a simple economic fact  the driver's need to eat. As Davis said, "it's to his advantage to make the call because otherwise how is he going to earn a living?" And when it was suggested to respondent's witness Naroden that "if you didn't want to make the call, you wouldn't answer," he was nonplussed by such a bizarre idea. Naroden answered, "I don't know what you mean by that. After all I am out there to try to do my business." And when asked whether *203 the Association imposed any penalty upon a driver for failure to obey a dispatcher's call Goldfarb himself answered, "Never had that experience, don't know." As the Iowa Supreme Court said in the Kaus case, supra, 299 N.W., at page 419:
"We think it is not inconsistent with the employer-employee relation that the drivers can, if they see fit, reject calls * * * or that they have the privilege of making personal use of the cars. * * * In the very nature of things, no driver will pay $3 and furnish the gasoline to use a taxi for twelve hours and reject many calls or make extensive personal use of the car."
Furthermore, it seems to us obvious that Goldfarb and the other members of the Association would not long tolerate a driver doing as he pleased. If at one time all of the cabs refused to answer customers' calls, and each one of them departed on the driver's personal business, it would in a day greatly damage or even destroy the good will and the value of the Association's name and enterprise. The result would be the same in a short time if not all but a substantial fraction of all of the drivers did so each day. Beyond that, the city would very likely revoke the licenses if the service were continuously haphazard.
Moreover, there is evidence which indicates that Hannigan was more to Goldfarb than just a man who rented a cab whenever the mood seized him. We have already commented upon the fact that Goldfarb assigned to Hannigan a particular cab and a particular shift, which Hannigan drove during all the months he was associated with Goldfarb. In addition, Goldfarb testified that only a single written leasing agreement was made with Hannigan, and that was made before Hannigan took the cab out for the first time. That is hardly consistent with sporadic, intermittent daily rentals.
Goldfarb testified Hannigan did not drive the cab every day, but came and went as he pleased. Goldfarb's records were in such shape that it is difficult to determine from them whether or not that was so. The record from July 3 to September 5 indicates it was not so. Hannigan worked 51 out of the 64 calendar days of that period. Furthermore, the fact that he registered only once with the Association for *204 cab No. 272 indicates that Hannigan was identified by Goldfarb and the Association with that cab during the night shift for all the months he drove. That, as well as the single lease at the beginning of the relationship, are inconsistent with the idea of a drifter who took a cab out now and then for his own amusement or profit.
Hannigan is dead and cannot tell us whether Goldfarb gave him orders, but in his belongings was found an interesting writing, signed by Goldfarb, reading as follows:
"Don, please keep car international for tonight and Sunday also Sunday night. Pick up Naroden Monday A.M."
"International" means a 24-hour, around-the-clock shift. This message is much more like an order from employer to employee than a message from a lessor to an intermittent lessee.
Finally, and most interestingly, it developed in the testimony that Hannigan (and the other drivers) frequently did not pay the stipulated rental. Goldfarb testified he had a list of such unpaid balances "that big." Such magnanimity is suggestive of adjustments made between employer and employee to meet conditions of season, weather, accident or other circumstances which interfered with the driver's earnings and expected fares. Indeed, Goldfarb admitted that he lowered the rental at certain seasons, and when a cab was taken out late.
The parties have briefed and argued the case as if it were to stand or fall upon proof of the right to control the details of the work, or the lack of it. They have taken that approach undoubtedly because many New Jersey cases have said that such right to control is the primary test of the employer-employee relationship. Piantanida v. Bennett, 17 N.J. 291 (1955); Wilson v. Kelleher Motor Freight Lines, Inc., 12 N.J. 261 (1953). Therefore we have examined the facts in this case, to this point, principally upon that basis.
However, Larson says (§ 43.30) the right to control is not "the underlying principle that really tips the scales in close situations." He says (§ 43.50) that "what actually *205 influences the decision[s], not necessarily what appears in briefs or opinions on this kind of question," is "the nature of the claimant's work in relation to the regular business of the employer." He calls this the "relative nature of the work test," and he says that under this test "are considered: whether the work done is an integral part of the employer's regular business; and whether the worker in relation to the employer's business is in a business or profession of his own" (§ 43.53). He points out that in this he follows § 220 of the Restatement of Agency, which provides that among the tests to be used "in determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: * * * (b) whether or not the one employed is engaged in a distinct occupation or business; * * * (h) whether or not the work is a part of the regular business of the employer * * *."
Larson says that among the reasons why the courts treat this as "the most relevant factor," even when they do not expressly say so, are the following (§§ 43.51, 45.10):
"The theory of compensation legislation is that the cost of all industrial accidents should be borne by the consumer as a part of the cost of the product. It follows that any worker whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it forms in itself a separate route through which his own costs of industrial accident can be channelled, is within the presumptive area of intended protection. * * *
There are several reasons why the control test is in practice giving way to the relative-nature-of-the-work test. Two have already been discussed; the logical irrelevance of the tort-connected test of control to the objectives of social legislation generally, including workmen's compensation; and the vagueness of the test, resulting both from the lack of agreement or rules on the weight given to various features of the relation, and from the fact that the right of control is itself an inference or conclusion, seldom capable of direct proof.
There is a third reason. With the advent of social and labor legislation * * * drawing a distinction between independent contractors and employees, there has been an increasing effort on the part of employers to avoid both the financial cost and the bookkeeping and reporting inconvenience that goes with workmen's compensation, unemployment compensation, social security and the like * * * *206 these arrangements are often carefully drawn with an eye to the `control' test, and since employers are in fact sometimes willing actually to relinquish a considerable degree of control, it becomes very difficult to deal with these contracting-out cases with the old test. There is therefore beginning to be evinced in the decisions a sort of unexpressed conviction that if the proper scope of workmen's compensation and other remedial enactments is not to be defeated, a different criterion based on the realistic nature of the work must be given more weight."
It seems to us that, particularly in a case such as we have here, the "relative nature of the work test" has the advantages of logic, clarity and forthrightness. Cf. O'Brien v. Washington National Insurance Co., 17 N.J. Super. 549 (Cty. Ct. 1952). However, we need not now determine which of the tests is to be preferred, for in the case at bar we arrive at the same result with either the "right to control" or the "relative nature of the work" test.
In those cases in which the taxi driver has been held to be an employee in spite of a "three-phase arrangement," the courts have come to that conclusion for reasons which are well summarized in the following excerpt from Kaus v. Huston, supra (35 F. Supp., at p. 331) (emphasis ours):
"By narrow technical analysis of such relationship and particularly plaintiff's claimed want of control over the drivers, it is argued that the relationship of master and servant does not exist. It seems to me that this view of the question is too narrow. The real question for solution is, Does the plaintiff engage merely in the leasing of taxicabs, or does he operate a line of taxicabs as a common carrier of passengers? When all factors are considered and particularly the contractual relationship of the plaintiff with the passengers carried, I think there can be little doubt that plaintiff is operating the line of taxicabs, and that while he has adopted an ingenious method of fixing the compensation of his drivers and permits the drivers to exercise some discretion over the cab during the period of the driver's shift, nevertheless I think there is no discretion vested in the drivers inconsistent with the relation of master and servant. From the very nature of the case the drivers, in order to perform their duties properly, must exercise very complete control over the cabs while they have them out on their shifts."
Though we have no New Jersey case on all fours with the one at bar, the holdings and the philosophy of the cases we do have dealing with the employer-employee relationship *207 in general lead us to the conclusion that, as was said in Kaus v. Huston, supra, the real question for solution here is, does Goldfarb "engage merely in the leasing of taxicabs, or does he operate a line of taxicabs as a common carrier of passengers?" And to paraphrase the language quoted from the Kaus v. Huston opinion, when all factors are considered we think there can be little doubt Goldfarb is operating a line of taxicabs as a common carrier of passengers, and that while he has adopted this method of fixing the compensation of his drivers, they are nevertheless his employees. One cannot call these drivers "independent contractors" or entrepreneurs without embarrassment. As the Iowa Supreme Court said in Kaus v. Unemployment C.C., supra, at p. 419 of 299 N.W.:
"It can scarcely be claimed that the drivers are in business for themselves. At least so far as the public is concerned, they lose their identity except as drivers for the United Cab Co. No driver advertises, insures, owns a cab, maintains an office or stand, or has a business telephone. The public deals with the United Cab Co. Its advertisements promising safe, courteous and prompt service at reasonable cost serve as inducements. When a call is received by appellee he necessarily undertakes to furnish that kind of service and delegates to the drivers the duty so to do. It is not reasonable to conclude that appellee does not direct and require his drivers to serve his customers in the manner he advertises to serve them. Appellee forbids the drivers the use of intoxicating liquor, requires them to drive carefully and observe the traffic laws, to be courteous in dealing with the public, to keep the cabs clean, to conduct themselves so the passengers will not complain of their conduct, and requires them to adhere to the established schedule of fares. He has also dictated which shift the driver shall have and discharged those whose services were not satisfactory."
Appellant argues that since the ordinance, in the language quoted above, forbids rental arrangements such as Goldfarb says he made here, this court as a matter of public policy should refuse to countenance it. Respondent says this argument was rejected in Wilson v. Kelleher Motor Freight Lines, Inc., supra, 12 N.J. 261, 266 (1953); but see Runk v. Rickenbacher Trans. Co., 31 N.J. Super. 350, 355 (App. Div. 1954). However, it is to be noted that in the Wilson case the court was dealing with I.C.C. regulations, while *208 here we have an ordinance backed by a statute, R.S. 48:16-1 et seq. In Diamond Cab Co. v. Adams, supra, 91 Ga. App. 220, 85 S.E.2d 451, 452 (Ct. App. 1954), the court held:
"Diamond Cab Company, having obtained a permit to operate taxicabs upon the streets of Atlanta, was bound to operate taxicabs in compliance with that city's regulatory ordinances, including an ordinance that no taxicabs shall be operated by any person other than the owner, or his duly licensed employee, and cannot delegate its duties as an operating company to its drivers, by an arrangement of leasing its taxicabs to drivers as independent contractors rather than as employees, in order to avoid liability under the Workmen's Compensation Act for death or injury to its drivers."
Since we can and do decide the case at bar upon other grounds, we prefer not to pass upon this question of public policy at this time.
The judgment of the County Court is therefore reversed. The County Court concluded that the finding that Hannigan was not an employee "makes it unnecessary for this Court to consider the issues created by the Deputy Director's refusal to permit testimony that the decedent, Donald Hannigan, was intoxicated at the time of the accident." The case will therefore be remanded to the County Court to consider those issues as well as to make findings of fact and conclusions of law from its review of the record in the Division with respect to all necessary elements of the claim (which it did not make by reason of the basis of its decision), and enter judgment as it shall finally determine the case, not inconsistent with this opinion. If the County Court finds it necessary to remand the case to the Division for further testimony on any issue it may, of course, do so.