WEST CAB COMPANY, INC., *et al.*, Appellants, v. THE INDUSTRIAL COMMISSION *et al.* (Kareem Verdun *et al.*, Appellees).

First District (Illinois Workers' Compensation Commission Division)
No. 1—06—2566WC

Opinion filed August 21, 2007.—Rehearing denied October 16, 2007.

DONOVAN, J., dissenting.

Daniel J. Ugaste, of Nyhan, Pfister, Babrick, Kinzie & Lowry, P.C., of Chicago, for appellants.

William A. Jaeger, P.C., of Chicago, for appellees.

JUSTICE HOLDRIDGE delivered the opinion of the court:

Michael Gray leased a taxi vehicle from respondent West Cab Company on a regular basis. On August 7, 1994, Gray was in the leased taxicab when he was shot and killed by an armed assailant. An application for adjustment of claim was initially filed by the deceased's mother, Clennie Gray, on September 2, 1994, identifying the decedent as the claimant. Subsequently, amended applications were filed naming certain dependent children of Gray as claimants. Each of these applications was filed solely against West Cab Company. A subsequent amended application added Northwest Cab Company and Northwest Package Delivery Service, Inc., as respondents.

Following multiple hearing dates, the arbitrator issued a decision on March 5, 2002, finding claimants had failed to prove the deceased, Michael Gray, was an employee of any of the three respondents, holding that Gray was an independent contractor who merely leased a taxicab from West Cab. While the hearing before the arbitrator included several other issues, the decision did not address any other issue due to the finding on the threshold issue of employer/employee relationship.

Claimants sought review before the Commission, which reversed the arbitrator's decision. On January 30, 2003, in a 2 to 1 decision, the Commission found that the deceased was an employee of all three

corporations at the time of his death and that it would retain jurisdiction over the remaining questions and not remand the case to the arbitrator for a further decision. This final procedure of retaining the case was done without objection from either side.

On October 28, 2003, again by a 2 to 1 decision, the Commission found that Michael Gray's death arose out of and in the course of his employment, with all three respondents, and awarded benefits to the claimants. The respondent corporations then appealed to the Cook County circuit court, which confirmed the Commission's decision. Respondents then filed this appeal. We reverse, finding that Gray was not an employee of any of the respondents.

## BACKGROUND

Sometime during the early morning hours of August 7, 1994, in Franklin Park, Illinois, Michael Gray was shot and killed while in a taxicab leased to him by the West Cab Company.

James Bennett, Sr., testified he had been the manager of West Cab since approximately 1992. At the time of hearing, he concurrently managed West Cab, Northwest Cab and Northwest Package Delivery Service, just as he did in August 1994. All three businesses were owned by the same person, Jerilyn Ugaste. Bennett had been the president of Northwest Cab since 1963, and Jerilyn Ugaste had been the president of West Cab since approximately 1980. Bennett testified that West Cab would lease taxi vehicles it owned to lessees on a daily basis from it's Schiller Park location. While medallions were not required in Schiller Park, he said either the state or the municipality did require the taxicabs to be registered with the state. Pursuant to a lease agreement, Bennett testified that lessees would come to West Cab to lease a taxicab, West Cab would log the lessee in while noting the time and mileage, and when the cab was returned, the driver would pay his or her lease fee. Bennett stated that in 1994, lessees would pay West Cab $1.85 per hour plus 22 cents a mile for the taxicab. He estimated that the average cost of taxicab rental was about $50 per day in 1994. The logs that were kept as to when specific lessees leased cabs were discarded once West Cab completed its bookkeeping; thus, Bennett testified, there is no way to now tell when or how often Michael Gray leased a taxicab. Lessee drivers were allowed to keep a taxicab as long as they wanted to but were required to pay a minimum charge of eight hours no matter how long they retained the taxicab. Lessees were not guaranteed to get the exact same taxicab each time they requested a car, but they could request the same one if available. If a taxicab was not available when a lessee came in to lease one, the lessee would have to wait until a taxi was returned, as West Cab was under no obligation

to have cabs available to lessees. There were no set or scheduled times for lessees to obtain taxicabs. Bennett testified that drivers never had to notify West Cab about any fares they would pick up in the taxicabs. While West Cab did not require any specific documentation from lessees when they signed a lease agreement, Bennett noted that Schiller Park required drivers to be fingerprinted and processed.

Bennett testified that in 1994, on average, there were two daytime dispatchers, 1½ in the afternoon and 1 at night. During the day, one dispatcher simultaneously worked for Northwest Cab and West Cab, while the other dispatched for Northwest Package Delivery. The night dispatcher would take calls for all three companies. Bennett admitted that there were West Cab and Northwest Cab taxicabs that had "Northwest Package Delivery" written on them, although he said this was due to an Illinois Commerce Commission rule based on the leasing of the cab to Northwest Package Delivery.

Bennett testified that he knew Gray and, "depending, sometimes he would drive three days, five days, six days" a week, but noted he had no records to confirm or prove this. Bennett acknowledged that the taxicab lease in evidence as petitioner's exhibit No. 5 was between Michael Gray and both West Cab and Northwest Cab, noting Gray "occasionally did drive a Northwest Cab if a West Cab wasn't available," and indicating both companies had the same owner but were separate corporations. In a second round of testimony, Bennett stated that lessee drivers could lease cabs from either West Cab or Northwest Cab. The leases would last "indefinitely . . . until [the lessee does not] want to lease anymore." He stated that Michael Gray was not an employee of Northwest Package Delivery and noted that Northwest Package Delivery had 20 to 22 of its own employees who were paid hourly wages in August 1994, and it carried workers' compensation coverage on these employees. He further testified that West Cab did not carry workers' compensation insurance coverage on lessees.

According to Bennett, West Cab dispatchers would sometimes give package delivery orders from Northwest Package Delivery to drivers who leased its cabs when Northwest Package Delivery's regular delivery drivers were unavailable. The dispatcher would get a package delivery order by phone and then "put it on the air," *i.e.*, on the radios of the cabs, for bid, and drivers for either West Cab or Northwest Cab could then bid on the delivery, in the same way they would bid on taxicab passenger dispatches. Once a bid was accepted, the lessee would pick up the package and deliver it. Bennett testified the driver would receive the full fee for the package delivery minus a 14% handling fee that went to Northwest Package Delivery "for the paperwork." Lessees paid no fees to West Cab for passenger fares.

Usually the lessees would receive "charge vouchers" for package deliveries. It appears these vouchers essentially were received when the customer was paying Northwest Package Delivery on credit or by credit card, and the driver would receive a voucher verifying the package delivery fee. Lessees could then give these vouchers to West Cab as payment toward their taxicab lease costs. If the vouchers turned in totaled more than what the lessee owed West Cab, West Cab would return the overage to the lessee by way of a check. The package delivery customers would be billed by Northwest Package Delivery, and Northwest Package Delivery would then reimburse West Cab for the vouchers it received from its lessees. Bennett testified that West Cab earned income out of this arrangement because lessees would run up mileage in the process of package delivery, but verified that Northwest Package Delivery kept the entire 14% handling fee. Bennett further testified that West Cab lessees would frequently earn enough money delivering packages to cover the costs of leasing a taxicab. He stated West Cab would keep individual sheets of paper listing package deliveries made by lessees and the names of the customers, but that these would be discarded after seven days. A "blue ticket" would also be kept with each order indicating the delivery fees. Drivers were not required to accept any package delivery orders. Bennett stated that oftentimes no lessees would respond to a package delivery bid offer over the radio. He did not know how much of Gray's income in driving the cab was based on package deliveries for Northwest Package Delivery, as, again, the records from 1994 no longer exist.

Bennett acknowledged that Gray leased a taxicab from West Cab on the date of the incident, August 7, 1994. Lessees were required to post a onetime deposit with West Cab as bond security, and Bennett confirmed that Michael Gray had paid a $50 deposit, noting all of West Cab's leases with drivers were the same as the one signed by Michael Gray in petitioner's exhibit No. 5.

Identical leases are still used by West Cab and Northwest Cab. Lessee drivers could do anything they wanted with the leased taxicab after picking it up, including personal and nontaxi use, as West Cab would get paid hourly and mileage fees regardless of a lessee's use. Lessees were not limited to any specific geographical area, although, per Chicago city ordinance, they could not go into Chicago to pick up fares unless they were requested by someone within Chicago city limits to pick them up to bring them back to Schiller Park. Lessees could take Schiller Park passenger fares anywhere. Only the lessee was allowed to drive a leased taxicab, with Bennett again noting that Schiller Park required all taxi drivers to be licensed. The lessee was responsible for purchasing gas and could purchase it from anywhere he wanted.

West Cab was responsible for maintaining the cabs in working condition, including services like the replacement of a flat tire or burned-out headlight. Bennett indicated that taxicabs were serviced by West Cab every 4,000 miles, and the Village of Schiller Park would inspect the taxicabs annually. He testified that pursuant to the lease, no compensation was paid by West Cab to a lessee, and lessees were not required to report any of their earnings to West Cab. Bennett testified that West Cab maintained no right to control a lessee's operation of the vehicles, and West Cab exercised no such supervision over lessees, including the deceased.

Bennett agreed that West Cab provided dispatch services to lessees, stating West Cab would receive calls for taxi service and would put the request over the radio for bids from lessees. West Cab would continue to offer the request over the radio until a lessee would bid on it, and if no lessee ended up making a bid, West Cab would either call the customer back and indicate it could not offer a ride or would otherwise give the order to a competitor. Bennett said there were no advertisements inside the cabs, and West Cab had no right to contact a lessee to have him or her bring in a cab for inspection.

West Cab provided public liability insurance on the taxicabs. Bennett testified that this was done due to requirements of the state. He again noted West Cab did not provide workers' compensation coverage for lessees because it was in the leasing business, not the taxicab business. He indicated a lessee's lease would end when the driver requested that the lease end and therefore requested his or her bond deposit back. West Cab could not terminate a lease without cause. While lessees would sometimes report any problems they may have had with a taxicab when they returned the vehicle, they were not required to do so or to make any reports to West Cab. Bennett testified that the company name was written on the side of the cabs because Schiller Park required this, as well as a requirement that all taxicabs in their fleet must be painted the same color, a color that other cab companies then could not use.

Bennett testified that on the date of the accident, Gray's bid on the dispatch to the 3000 block of Prairie in Franklin Park was for a passenger pickup, not a package. On cross-examination, Bennett indicated he knew this because "I believe we brought evidence as far as the tickets to show it was a passenger."

On further cross-examination, Bennett reiterated that the lease document constituted the entire agreement between West Cab and the lessee, but agreed that the requirement of a $50 bond deposit was not stated in the lease. When asked why West Cab and Northwest Cab shared the same facility, Bennett stated he did not know, noting

Northwest Cab was older than West Cab, and he believed "when West Cab moved into our facilities that we started dispatching out of there to them." In questioning Bennett, claimants' attorney raised the point that it would be in West Cab's best interests if lessees used the leased vehicles as taxicabs because otherwise lessees would put minimal mileage on the taxicabs. Bennett agreed that it was in West Cab's interests to have mileage put on the car given the mileage fees, but that it was irrelevant to West Cab how mileage was put on the car. Bennett reiterated that only the lessee had permission to drive the leased vehicle, as "we are only leasing to one person at a time," and that this included nonlessees who may have been licensed to drive a taxi by Schiller Park. Bennett agreed that West Cab and Northwest Cab would get the benefit of additional mileage when lessee drivers delivered packages for Northwest Package Delivery.

James Bennett, Jr., Bennett's son, testified he was the assistant manager of all three respondent companies and that Jerilyn Ugaste was his mother. James Bennett, Sr., testified that Jerilyn Ugaste was his ex-wife. He verified that Northwest Package Delivery would reimburse West Cab when West Cab lessees would deliver packages and turn in charge vouchers to West Cab.

Claimants entered various exhibits into evidence. Petitioner's exhibit No. 1 was a subpoena issued to West Cab, dated July 7, 2000, requesting all documents from "the keeper of records of taxi drivers" and requesting a multitude of specific documents with regard to the deceased, Michael Gray, records of telephone orders for passenger or package delivery on August 7, 1994, and all log and dispatch records from August 1, 1994, through August 31, 1994. Petitioner's exhibit No. 2 entails two checks from a West Cab account, both made out to "M. Gray": the first is dated August 5, 1994, in the amount of $8.75; the second is dated August 7, 1994, the date of accident, in the amount of $10.68. Both are signed by James Bennett, although the signatures clearly were not made by the same person. Petitioner's exhibit No. 3 includes several "order forms" dated either August 6 or August 7, 1994. All but one of these forms indicates they are orders involving cab number 14, but they give various flat rates for services, the names of persons who requested service, and some designation as to the addresses "from and to," although these are relatively illegible and were not helpful without supporting testimony as to the specific information they provide.

Petitioner's exhibit No. 5 was the lease agreement between the deceased, Michael Gray, and both West Cab and Northwest Cab, dated January 8, 1990. It specifically states that lessors "Northwest & West Cab Co." were the "owners or lessors" of "certain automobiles and

taxicabs" operated in the Schiller Park area. It states a lessee is to be licensed as "operator and chauffeur" by Schiller Park and the state, and notes that he/she "desires to rent a taxicab from lessor." Lessee agrees to rent "a taxicab" for the term of the contract, not to exceed 24 hours, and return it in "as good condition, reasonable use and ordinary wear and tear excepted," as when received by lessee. The rental cost section leaves blank the space indicating the duration of a "rental period" but indicates "each workday a fixed fee of $1.85 and 22 cents per mile plus cost (at prevailing price) of gasoline used, the time and place of purchase to be in his discretion, (non-leaded grades or better)." Michael Gray had the right to lease the car for over eight hours; however, the blanks are not filled in indicating what the "pro-rata adjustment" would be to the hourly rate if leased over eight hours or what the minimum rental fee was. The lessee was required to comply will all applicable taxicab operation laws, ordinances and regulations, and he was to give to lessor "any records required to kept by him by such laws, ordinances or regulations." The lessee agreed that he would cooperate with lessor to recover all losses of lessor's due to accident, and that lessee would only have the cab repaired at places designated by lessor, unless prior approval was given. The lease specifically rejects this lessor/lessee relationship as being "principal & agent" or "employer and employee" and states that nothing in it should be so construed. It states that "lessee shall perform" various conditions "according to his own means and methods which shall be in his exclusive charge and control." These include, as paraphrased by the Commission:

"—Lessee is free of the control or direction of lessor in operating the cab, lessor has no right to and will not attempt to exercise any supervision over lessee in such operation, and that lessee isn't required to account for or share fares with lessor.

—Lessee is not restricted in any manner as to where he can operate, to remain at any specific location or assigned to any fixed hours.

—Lessee is 'never' required to report the whereabouts of the cab during the agreed lease period, noting 'any right to control exists solely in the passenger . . . subject to the discretion of lessee.'

—All of lessee's expenses in performing the lease are his responsibility.

—Lessor agrees to provide 'such financial responsibility' as required by Schiller Park and the State of Illinois.

—Lessor is not responsible or liable for any injury to lessee resulting from use of cab, but lessee can insure himself against such injury if he so desires.

—Lessor isn't liable to lessee if it cannot deliver a taxicab due to unavailability at the time lessee requests one.

—Lessee is not required to accept any radio dispatches he does not want to accept

—Lessee understands all tax liabilities, including federal and state income taxes, social security taxes, and any and all other employment or right to work taxes that may be imposed are his sole responsibility, and 'lessee agrees to file all returns required in connection with such taxes and be personally responsible for the payment of said taxes. Lessee is aware that he is responsible for the payment of federal self-employment taxes.'

—Lessee understands he isn't lessor's employee for purposes of 'unemployment insurance, compensation or unemployment insurance laws of the State of Illinois.' "

The Commission determined that Gray was an employee of all three companies. Relying upon *Yellow Cab Co. v. Industrial Comm'n*, 238 Ill. App. 3d 650 (1992), the Commission determined that all three companies exercised the requisite degree of control over Gray to warrant a finding that he was an employee of each company. The Commission then found Gray's death was compensable and awarded compensation to all claimants.

## ANALYSIS

This matter turns squarely on the question of whether the Commission properly determined that Michael Gray was an employee of West Cab Co., Inc., Northwest Cab Co., Inc., and Northwest Package Delivery Service, Inc. We find that the Commission erred on this question.

■ Whether an employer-employee relationship exists is a question of fact. *Morgan Cab Co. v. Industrial Comm'n*, 60 Ill. 2d 92, 97 (1975). There is no rigid rule of law for determining whether an employer-employee relationship exists; rather, such a determination depends upon the particular facts of the case. *Ragler Motor Sales v. Industrial Comm'n*, 93 Ill. 2d 66, 71 (1982). The Commission's finding on this question will not be disturbed unless it is against the manifest weight of the evidence. *Ragler*, 93 Ill. 2d at 71. Since no one factor determines the nature of the relationship between the parties, a variety of factors must be considered, including "the right to control the manner in which the work is done, the method of payment, the right of discharge, the skill required in the work to be done, and who provides tools, materials, or equipment." *Morgan Cab*, 60 Ill. 2d at 97. Of these factors, the right to control the manner in which the work is done is the paramount factor in determining the relationship. *Morgan Cab*, 60 Ill. 2d at 97-98.

■ In finding that Gray was an employee, the Commission relied heavily upon *Yellow Cab Co. v. Industrial Comm'n*, 238 Ill. App. 3d

650 (1992). In *Yellow Cab*, the court noted that in cases involving taxicab drivers, particular weight should be given to the following factors in determining the issue of control of the manner in which the work is done: (1) whether the driver accepted radio calls from the company; (2) whether the driver had his radio and cab repaired by the company; (3) whether the vehicles were painted alike with the name of the company and its phone number on the vehicle; (4) whether the company could refuse the driver a cab; (5) whether the company has control over work shifts and assignments; (6) whether the company requires that gasoline be purchased from the company; (7) whether repair and tow service is supplied by the company; (8) whether the company has the right to discharge the driver or cancel the lease without cause; and (9) whether the lease contains a prohibition against subleasing the taxicab. *Yellow Cab*, 238 Ill. App. 3d at 653.

■ In the instant matter, of the nine factors enumerated in *Yellow Cab*, only two were present: the cab was painted with the company's logo and phone number; and the fact that the lease contained a prohibition against subleasing. Here, the lessee was not required to respond to radio dispatches from the company; the lessee did not pay for maintenance of the vehicle; while the car was painted to the lessor's specifications, the lessor could not and did not install advertising in the car; the lessor did not have the right to inspect the vehicle; the lessor could not refuse to provide the driver with a cab; the company had no control over work shifts or assignments; the company did not require lessees to purchase gasoline from the company; there was nothing in the record to establish that the company provided towing and road service; and there was no right to discharge a driver or cancel the lease unless such discharge or cancellation was for cause. (In *Yellow Cab*, the court found that the ability to discharge or cancel *without* cause was an indicia of control. *Yellow Cab*, 238 Ill. App. 3d at 654.)

Based upon the evidence, we find that the Commission's finding of an employee-employer relationship is against the manifest weight of the evidence. The fact that the cab was painted to the company's specifications and the limitation on subleasing, standing alone against the overwhelming weight of contrary evidence, simply cannot support a conclusion reached by the Commission. We find the opposite conclusion is clearly apparent. To the extent that our decision in the instant matter may be at odds with the holding in *Yellow Cab*, we now overrule that holding.

As we find that claimants' decedent was not an employee under the Act, we do not need to address the several other issues raised by the appellants.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County confirming the decision of the Commission is reversed.

Reversed.

McCULLOUGH, P.J., and HOFFMAN and GROMETER, JJ., concur.

JUSTICE DONOVAN, dissenting:

I do not agree with the majority's view that the Commission's decision regarding the existence of an employer-employee relationship is contrary to the manifest weight of the evidence, and I do not believe that the majority has identified a good cause or compelling reason to overrule the holding in *Yellow Cab Co. v. Industrial Comm'n*, 238 Ill. App. 3d 650, 606 N.E.2d 523 (1992). In my view, the resolution of the question of the existence of an employer-employee relationship is controlled by the line of "cab lease" cases including *Morgan Cab Co. v. Industrial Comm'n*, 60 Ill. 2d 92, 324 N.E.2d 425 (1975), and *Yellow Cab*, 238 Ill. App. 3d 650, 606 N.E.2d 523. Therefore, I must respectfully dissent.

Whether an employer-employee relationship exists between a respondent and a claimant is primarily a question of fact to be decided by the Commission, and a reviewing court will not disturb the factual findings of the Commission unless they are contrary to the manifest weight of the evidence. *Crepps v. Industrial Comm'n*, 402 Ill. 606, 609, 85 N.E.2d 5, 6-7 (1949). Thus, the question before us is not whether an employer-employee relationship existed between the parties at the time of the accident, but whether the Commission's finding that such relationship did exist is against the manifest weight of the evidence or lacks a substantial foundation in the evidence. *Crepps*, 402 Ill. at 609, 85 N.E.2d at 7.

There is no rigid rule of law defining whether a worker is an employee or an independent contractor. *Ware v. Industrial Comm'n*, 318 Ill. App. 3d 1117, 1122, 743 N.E.2d 579, 583 (2000). In considering whether a worker is an employee or an independent contractor, the Commission may consider a number of factors, including the right to control the manner in which the work was done, the method of payment, the right to discharge, the skill required in the work to be done, and the provider of the materials and equipment (*Morgan Cab*, 60 Ill. 2d at 97, 324 N.E.2d at 428), and the nature of the claimant's work in relation to the employer's business is also a significant factor (*Ragler Motor Sales v. Industrial Comm'n*, 93 Ill. 2d 66, 71, 442 N.E.2d 903, 905 (1982)). Of these factors, the right to control the work has been

considered a predominant factor in determining the relationship of the parties. *Morgan Cab*, 60 Ill. 2d at 97-98, 324 N.E.2d at 428. In that regard, it is the right of control, not the fact of control, that is the principal factor in distinguishing an employee from an independent contractor. *Davila v. Yellow Cab Co.*, 333 Ill. App. 3d 592, 596, 776 N.E.2d 720, 724 (2002).

In *Morgan Cab*, the Illinois Supreme Court was called upon to consider whether a taxi driver who drove a cab under circumstances similar to the case at bar was an employee or an independent contractor of the cab company. See *Morgan Cab Co.*, 60 Ill. 2d at 98-99, 324 N.E.2d at 428-29. Since it was a case of first impression, the Illinois Supreme Court considered the issue of the cab company's right to control the manner in which the claimant performed his work in light of decisions from other jurisdictions and stated as follows:

> "In *Hannigan v. Goldfarb* (1958), 53 N.J. Super. 190, 147 A.2d 56, the cab driver paid $8 per 12-hour shift for the use of a cab. The driver kept all fares and tips and paid for all of his gasoline and oil. The court in holding for the claimant under the Workmen's Compensation Act rejected the cab owner's argument that the driver was not an employee as he was not compelled to work. It has been argued the driver could ignore the dispatcher's messages, park his cab and go to sleep if he chose. The court said the argument was unrealistic and that the cab owners would not tolerate such conduct by a driver. The court held that the cab owner had the right to control the work of the driver within the limitations set by the very nature of a cab driver's work. Too, the court asked itself the question whether the cab owner was merely engaged in the leasing of taxicabs or was he operating a fleet of taxicabs as a business. It concluded that he was in the business of operating taxicabs. In this connection the court quoted from *Kaus v. Huston* (N.D. Iowa 1940), 35 F. Supp. 327, 331, a case in which it was held that a cab driver was to be deemed an employee and entitled to unemployment benefits. The language quoted is relevant here:
>
> > ' "By narrow technical analysis of such relationship and particularly plaintiff's claimed want of control over the drivers, it is argued that the relationship of master and servant does not exist. It seems to me that this view of the question is too narrow. The real question for solution is, Does the plaintiff engage merely in the leasing of taxicabs, or does he operate a line of taxicabs as a common carrier of passengers? When all factors are considered and particularly the contractual relationship of the plaintiff with the passengers carried, I think there can be little doubt that plaintiff is operating the line of taxicabs, and that while he has adopted an ingenious method of fixing the

compensation of his drivers and permits the drivers to exercise some discretion over the cab during the period of the driver's shift, nevertheless I think there is no discretion vested in the drivers inconsistent with the relation of master and servant. From the very nature of the case the drivers, in order to perform their duties properly, must exercise very complete control over the cabs while they have them out on their shifts."

*** [W]hen all factors are considered we think there can be little doubt *** they are *** his employees. One cannot call these drivers "independent contractors" *** without embarrassment.' *Hannigan v. Goldfarb*, 53 N.J. Super. 190, 206-207, 147 A.2d 56, 65-66." (Emphasis omitted.) *Morgan Cab*, 60 Ill. 2d at 98-99, 324 N.E.2d at 428-29.

Having considered the issue of an employer-employee relationship in light of the reasoning expressed by courts in other jurisdictions and its own reasoning in unemployment compensation cases, the supreme court concluded that the evidence established that the cab company had the right to control the activities of the driver and that the cab company was in the business of operating a fleet of cabs for public use, rather than merely leasing vehicles with no interest in their operation as taxis.

As noted in the majority opinion, the resolution of the control factor has been influenced by circumstances such as whether the driver accepts radio calls from the company; whether the driver has his radio and cab repaired by the company; whether the leased vehicles were painted alike with the name of the company and its phone number on the vehicles; whether the company could refuse the driver a cab; whether the company controls work shifts and assignments; whether the company dictates where the drivers may purchase gas or obtain repair or tow services; whether the company requires the drivers to be courteous with customers; whether the company has the right to discharge the driver or cancel the lease; whether the company lease prohibits subleasing; and whether the company was in the business of operating a fleet of cabs for public use. *Yellow Cab*, 238 Ill. App. 3d 650, 606 N.E.2d 653.

Considering the evidence in this case in light of the aforementioned principles and legal authorities, I conclude that the Commission's finding of an employer-employee relationship between the respondent and the claimant's decedent is supported by the evidence and is not against the manifest weight of the evidence. While this is certainly a close case, I find sufficient evidence in the record to support the Commission's findings that the respondents retained the right to control the manner in which the work was performed and that the respondents

were in the business of operating a fleet of cabs for the use of the Schiller Park community.

In the case at bar, the lease agreement expressly disclaims an employer-employee relationship between the parties. Similar disclaimers were present in *Globe Cab Co. v. Industrial Comm'n*, 86 Ill. 2d 354, 427 N.E.2d 48 (1981), *Yellow Cab*, 238 Ill. App. 3d at 652, 606 N.E.2d at 525 (hereinafter *Yellow Cab II*), and *Yellow Cab Co. v. Industrial Comm'n*, 124 Ill. App. 3d 644, 464 N.E.2d 1079 (1984) (hereinafter *Yellow Cab I*). In each of those cases, the reviewing court affirmed the Commission's finding that the claimant was an employee of the cab company, concluding that the disclaimer alone was not dispositive of the claimant's status and that other factors supported the finding of an employer-employee relationship. See *Globe Cab*, 86 Ill. 2d 354, 427 N.E.2d 48; *Yellow Cab II*, 238 Ill. App. 3d at 652, 606 N.E.2d at 525-26; *Yellow Cab I*, 124 Ill. App. 3d at 647, 464 N.E.2d at 1081.

The lease agreement provides that the respondents own the taxicabs that are referred to as Northwest Cabs and West Cabs; that the respondents' cabs operate in the Schiller Park area of Cook County; that the respondents maintain offices, telephone, radio and other facilities for the reception of requests for taxi service from the general public at a central location in Schiller Park; and that the lessee be licensed as an operator and chauffeur. The lease also provides in pertinent part as follows:

"3. Lessee shall comply with all applicable laws, ordinances and regulations, whether federal, state, or local, *pertaining to the operation of a taxicab*: that he will turn over to the Lessor at the end of the rental period any records required to be kept by him by such laws, ordinances or regulations; that he will cooperate with the Lessor to recover all losses incurred by the Lessor due to accident; that *he will not repair the taxicab except at places designated by Lessor* unless prior approval for such other repair is given.

\* \* \*

6. Upon completion of each rental period hereunder, *either party may refuse to renew this contract*, in which event this contract shall be deemed terminated.

\* \* \*

8. The *fare structure shall be in accordance with the tariff rates* approved by Schiller Park, Illinois, in accordance with schedules filed and any amendments thereto \*\*\*." (Emphasis added.)

In its opinion, the majority seems to focus on provisions in the lease that appear to give a lessee complete freedom to operate the respondents' taxicab in any way he chooses, to the exclusion of other

provisions, including those set forth above, which clearly show that the respondents have retained a right to control a lessee's activities in accordance with their interests in operating their taxicab business, and that the work performed by a lessee was essential to the respondents' business operations.

For example, the majority points to the business manager's testimony that the drivers were not required to respond to radio dispatches from the company, but seemingly discounts the significance of his testimony that the respondents employed dispatchers 24 hours per day to notify the drivers about customers requesting taxi service. In my view, the provision of around-the-clock dispatchers is significant because it demonstrates that the respondents were in the business of operating a fleet of cabs for public use and that the work performed by the claimant's decedent was integral to the success of the respondents' business operations.

In its opinion, the majority seems to ignore a number of requirements and restrictions that the respondents imposed on the drivers who leased their taxis. The drivers were also required to have a valid operator's or chauffeur's license, to operate a cab bearing the logo and the telephone number of the respondents, to obtain repairs and maintenance at places designated by the respondents, and to comply with federal, state, and local regulations. The drivers were prohibited from subleasing the cab. The respondents could refuse to renew a lease. Given the number and nature of the requirements and restrictions, it is difficult to conclude that the respondents lacked control of the manner in which the work was performed or that the respondents were engaged in anything other than the business of operating a fleet of cabs for public use. See *Globe Cab*, 86 Ill. 2d at 363, 427 N.E.2d at 52. While reviewing the applicable case law on the existence of an employer-employee relationship, I found compelling a line in the *Yellow Cab II* case, wherein this court noted that "[t]he driving of the taxicabs in the fleet is certainly an integral part of the employer's business, and there is no other channel in this case through which the costs of claimant's work-related death can flow." *Yellow Cab II*, 238 Ill. App. 3d at 655, 606 N.E.2d at 526-27; see also *Globe Cab*, 86 Ill. 2d at 363, 427 N.E.2d at 52-53 (Ryan, J., concurring).

Finally, I note that the majority has gone beyond reversing the circuit court's decision confirming the Commission's finding of an employer-employer relationship. In its opinion, the majority writes, "To the extent that our decision in the instant matter may be at odds with the holding in *Yellow Cab*, we now overrule that holding." 376 Ill. App. 3d at 405. This court does not generally depart from established case law absent a good cause or compelling reasons. I am

troubled by the majority's failure to articulate what part or parts of its opinion could be considered "at odds" with the holding in *Yellow Cab II*, and its failure to provide any cause or reason to support its decision. I find no basis on which to overrule *Yellow Cab II*. I find that the Commission's finding that the claimant's decedent was an employee of West Cab Company and Northwest Cab Company is supported by the evidence and is not against the manifest weight of the evidence. Accordingly, I would affirm the decision of the circuit court confirming the Commission's decision in all respects except for its finding that Northwest Package Delivery Service, Inc., is an employer of the claimant's decedent.